## MOORE v. THE STATE.

1. Complaint that error was committed in overruling objection to testimony, when such testimony is not set forth literally or in substance in the motion for a new trial, or in a bill of exceptions brought to this court, will not be considered.
2. A new trial will not be granted the defendant in a criminal case because the court refused his request to notify a witness for the State upon the trial that he need not answer questions where the answers would criminate him.
3. It was not error for the court, in the concluding part of his charge to the jury trying a criminal case, to make the following statement: "It is now, gentlemen, only about one hour until Sunday; the law does not recognize that any business of a legal character can be transacted on Sunday. When you have reached the hour which by Waynesboro time is 11:32, you will discontinue any further consideration, discussion, or deliberation as to this case until Monday morning," notwithstanding the fact that the jury returned a verdict of guilty before Sunday arrived.
4. Where original insurance policies would be admissible on a trial for murder to establish a motive for the crime, and the evidence traces them to the possession of the defendant, who does not voluntarily produce them on the trial, the State may show by parol the contents of such policies without first giving the defendant notice to produce them.
5. Where defendant's counsel objected to the State's counsel asking a witness for the State leading questions, it was not error requiring a new trial for the court to state, in the presence of the jury, "The court has permitted counsel to ask this witness leading questions, as though he were an unfriendly witness."
6. There was sufficient evidence to establish the venue.
7. The evidence warranted the verdict, and the trial judge did not abuse his discretion in refusing a new trial. (HOLDEN, J. dissents.)

Argued October 23, 1907.—Decided March 6, 1908.
Rehearing denied March 27, 1908.

Indictment for murder. Before Judge Hammond. Burke superior court. July 1, 1907.

T. H. Moore, at the April term, 1907, of Burke superior court, was indicted, tried, and found guilty of the murder of his brother, John Moore, with recommendation that he be sent to the penitentiary for life. He made a motion for a new trial, and to the

judgment overruling the same filed a bill of exceptions. The deceased, John Moore, 18 years old, was found dead in the country on the 17th of January, 1907. Near his body were found the horse and buggy in which he and his brother (the defendant) and Joe Baggett left the store of the defendant the preceding afternoon. The horse was unhitched and was tied with one of the buggy-lines to a tree, and the legs of the deceased had been trampled on by the horse's forefeet. They were within five or six feet of a plantation road, very much traveled. The road at this point was near some houses. One house was 20 or 30 yards from the road opposite the point where the body of the deceased was found. About half-past four o'clock on Wednesday afternoon, January 16, 1907, at the store of the defendant in Keysville, Burke county, Georgia, the defendant said to the deceased, "John, go help Joe hitch up. I want you to go with Joe and me after them cows." The deceased replied, "Tom, I am not feeling well; I don't feel like going; let Will Burch go." Whereupon Will Burch said, "I don't mind going," or "I would rather go down there," or offered his services to go. Defendant told Will Burch to stay in the store until his brother, Son Moore, returned, and to give the keys of the store to him. The deceased at this time also said something about his foot hurting him. He went off with the defendant willingly, though he made the statement above referred to. The deceased was a clerk in the store of the defendant, and there was no other clerk. It appeared from the testimony given by Will Burch that he had never clerked in the store before, and knew nothing of the prices of the goods; but another witness testified that Will Burch sometimes clerked in the store. Will Burch, who did work plowing and at the carpenter's trade in the employment of defendant and Alf Moore, said he was in the store at the time, because he was sick and could not work. The defendant testified at the coroner's inquest that the deceased, Joe Baggett and himself went together to the Atwell place and left there about sundown. On Sunday after the killing the defendant pointed out to a witness where the deceased left him and Joe Baggett, which was two to two and a half miles from the Atwell place; but the witness did not know whether or not this was on Atwell's place or farm. The defendant stated at the inquest that the deceased left him and Joe at the Atwell place. He had intended for the deceased and Joe to drive the

cows, but the deceased complained of his shoes hurting his feet; and the defendant told the deceased that he (defendant) would walk to Keysville, and told deceased to go from there back to the Quaker road and to go to certain places to make some collections and deliver some messages. The defendant further testified at the coroner's inquest that he and Joe Baggett got home about ten or half-past ten o'clock that night. The next morning he thought that the deceased stayed at his brother's house. He asked his brother where John was, and, not finding him, he went to look for his brother and returned without finding him. During that afternoon the defendant and Will Burch made a trip to find the deceased, and found him. There was testimony that the defendant first discovered the body and said "I see my horse. I wonder if the horse ran away and killed him. . . I wonder where John is." Defendant and the witness drove in about eight or ten feet of the body. While defendant was in the buggy, he asked the witness what was the matter with the deceased. It was about five minutes before the defendant got out of the buggy. He told the witness who was with him to go and look at the body. The defendant acted like he did not care much, and exhibited no feeling. He walked around and looked at the body of the deceased, and said, "Untie the horse and let's go." Defendant sent a negro woman to the body and told her to stay there until he could go to Keysville and come back. The witness and defendant, with others, went back and carried the body of the deceased home. It was also in evidence, that, while one of the defendant's brothers and another person were talking in the store, the defendant came in and said, "What are you all talking about?" and stated, "I think you were all talking about having Joe arrested," and asked "Why was Joe arrested?" and further said, "I know Joe didn't have anything to do with it. I can clear him myself. Joe was with me, and we stopped at Mr. Poole's and got water, and we came on down to Will Wright's." Finally one of the witnesses told the defendant that he was suspicioned, to which he replied, "My Lord! I hope people don't think I did it. What could I have killed him for?" The witness then told him, "We have got insurance mixed up with it." The defendant replied, "I have got no insurance on John's life. Mother has got $2,000 she taken out year before last, but I do not know whether she kept it up or not." The defendant's

brother said, "Tom, you know mother is not able to keep up any premium at all on insurance," to which defendant replied, "Well, Mr. M. B. Gray offered me half of the premium if I would get the insurance for him. Mother and I did it on that account, as I had half of the premium on it as my commission as agent. I do not know whether the policy is in force or not." The witness then said to the defendant, "Tom, it looks very strange you have not taken any more interest in trying to locate this matter. Your brother seems to take more interest in it than you." The defendant then said, "I have got no money to work with, but am going to investigate this insurance. If there is any insurance, I am going to Augusta and hire a detective to work it up."

On Sunday, after the killing on Wednesday, a track of a No. 6 shoe was found leading off from the buggy near the place where the body of the deceased was lying when found dead. One of the witnesses testified that to the best of his knowledge the defendant wore a No. 6 shoe, but could not say that the track near the body of the deceased was the same track he saw in the road behind the cows. Another track, of about a No. 12 shoe, was found, leading up to the edge of some cleared land within about fifteen feet of where the deceased was found. Brogan-shoe tracks were found that "came out at a point about where the buggy was and went out in the field where the buggy was." They led to and beyond a new and unoccupied house.

One witness testified that wounds inflicted by pistol bullets were found on the head of the deceased, and another on the right side. Where one of these wounds was there were powder burns, and there appeared to be the print of a pistol on the flesh. One of the balls hit the deceased in his jaw on the right side and one behind his ear. There was a bullet-hole in the back of the buggy and one in the right-hand corner overhead. There was no blood in the buggy, or on the cushion, or on the wheels of the buggy, or on the foot of the buggy. One bullet-hole in the buggy was on the right side in the corner of the top of the buggy where the bend is; the other was in the back of the buggy, half-way back. The top was half-way down. The bullet went through the top of the buggy when it was left back. One bullet entered the head of the deceased about an inch or an inch and a quarter from the right eye, on the cheek, and came out practically opposite. Another bullet-hole was

through the lower jaw on the right side and went out on the same side. Both these wounds were much torn and ragged. There was another wound right under the jaw that came out. There was another wound right behind the ear, all on the same side, and that was powder-burned very black. There was another wound in the right shoulder about an inch below the joint, coming from the rear and coming out in front. There were five wounds in all. The bullet that entered the back of the ear did not come out, and this wound was burned black and had the imprint or indentation of a gun-pistol.

One night, about a month before the deceased lost his life, the defendant accused the deceased of taking change out of the drawer, and the deceased told him he did not. The defendant then told him, "Well, if that was the best he could do, he could go home where he belonged," whereupon the deceased said he would do it. Another brother begged him not to go, and he didn't go then; he said he was going Sunday, but never did go. He was to go the Sunday after he was found dead. A witness testified that the defendant passed him the morning of the day the deceased was found, looking for his brother, and said, "He didn't know what was the matter with John," and stated that the deceased never came back with him, as he sent the deceased off to collect some money and didn't know whether he got it or not, or whether somebody had hurt him or not; that he feared his brother might have gotten off and got some whisky and might have stayed out. There was evidence that the deceased sometimes drank. The defendant, with John Moore and Joe Baggett, on the 16th day of January, about 6:30 p. m., left the house of W. E. Johnson with a cow and calf. The deceased and Joe Baggett went off driving a cow, and the defendant went off behind driving a buggy. The coroner testified, that on Friday night after the deceased was found dead, just after the conclusion of the inquest, the defendant came to him and said he wanted to have a talk with him in regard to a certificate of John Moore's death. He told the coroner his mother had a policy on the life of the deceased, but she had lost it; but said if he could get hold of a copy of the policy, he thought it had to be lapsed three years before it was entirely void. Whereupon the coroner told the defendant to go to Dr. Beall and get a death certificate, as he was the proper party to give the certificate, as he

was the doctor at the inquest. On Monday morning after the deceased was missing on the preceding Wednesday night, the defendant approached Dr. Beall and said he wanted him to write a death certificate to the life-insurance company, stating that his brother was killed; and the physician then wrote the certificate. After writing the certificate for one policy, the defendant told him, "Here is another policy in the Equitable," for which he also wanted a certificate. The Union Central policy was for $2,000 payable to Mrs. Polly Moore; the amount of the other policy was $3,000 and was payable to the defendant, according to the recollection of the physician to whom the defendant handed the policies. About a week thereafter, the defendant requested the physician to say nothing about writing the death certificates. It was reported that the defendant was financially embarrassed at that time, and soon thereafter he was put into bankruptcy. The defendant stated that he was an agent of the Union Central. He was about 22 years old. The day on leaving the store, the defendant took his pistol from a shelf in the store and put it in his pocket. This shelf was where his pistol usually lay, and it was not an unusual thing for him to take it from there. He did it openly. He had on no coat and it could be seen after he put it in his pocket.

Joe Baggett, a negro, testified, that he, with the defendant and the deceased, reached Mr. Johnson's about 6:20 p. m. on the evening of the 16th of January, 1907, and got a cow and calf. He and the deceased started off from Mr. Johnson's with them, with the defendant in the buggy behind. They went to the Cross Roads, stopped to attend to a call of nature, and tied the cows. Afterwards he and the defendant drove the cattle on to Keysville, reaching there about 9 o'clock at night, and went to bed. The deceased went on from the Cross Roads in a buggy by himself. When the deceased left them at the Cross Roads, he went on ahead of the witness and the defendant. It was about 8 o'clock when the deceased left them at the Cross Roads, and he and the defendant went on to Keysville, driving the cows, and reached there about 9 or 10 o'clock at night. He did not know who killed the deceased. Before this witness testified, counsel for the defendant stated to the court and to counsel for the State that the witness had stated to the defendant's counsel that what is above related as his testimony was the truth, and that what he told others and to the grand jury

(hereinafter stated) was not the truth. The State's counsel contended that they had been entrapped by the witness Joe Baggett, and asked that they be allowed to impeach him; whereupon, in reply to questions, Joe Baggett further testified that he told counsel for the State and testified in the grand-jury room, that, when he and the defendant and the deceased reached the Cross Roads, the defendant and the deceased went off in a buggy together, and in about an hour and a half the defendant came walking back, and after they had untied the cows and started back to Keysville with the cows, the defendant said, "Joe, don't you tell anybody I went off from here in the buggy." The witness further told the State's counsel that what he had told him and testified to in the grand jury room was not the truth, and that he told it to get out of jail. He said he was told the day he was testifying that people said if he swore on this trial any way differently from the way he swore before the grand jury, and went back to Keysville, he would be killed. He testified further, that Mr. Will Daniel and Mr. Frank Hurst said to him that they believed that what he told before the grand jury was true, and that he had better stick to it, and that if he came in the court-room and told anything else, he would be handled for "prejudice;" and he told them that what he had stated before the grand jury was not true; that Mr. Will Daniel told him that if he testified the same thing he told the grand jury, he would go free, and when he went home, he (Mr. Daniel) would give him a job. The foreman of the grand jury testified that Joe Baggett, on Monday preceding the trial, testified before the grand jury substantially what the witness admitted he testified. The sheriff testified that Joe Baggett told him substantially the same story which the foreman of the grand jury testified Joe Baggett swore to before the grand jury, except that Joe Baggett said to him that the defendant told him if he told anybody he went off in the buggy, he would fix him. In the first statement he made to the sheriff, he told the sheriff what he swore to on the stand as being the truth, but afterwards told him substantially what the foreman of the grand jury swore to as being his testimony before that body. After making the last statement to the sheriff, he asked the sheriff about getting out of jail.

There was evidence that a buggy turned around in the road about 150 yards beyond where the body was found, and that the

tracks of the horse drawing it were similar to the tracks of defendant's horse. Witnesses testified to facts showing where cows appeared to be tied near the Cross Roads and about 1-¼ to 1-½ miles from where the body of the deceased was found. The defendant told a witness on the evening the body of the deceased was found, while the defendant and Will Burch were together, that he was going to look for his brother John, that he thought somebody had killed him, thinking it was him (the defendant). This same witness testified: "I couldn't tell you that Tom Moore said he was afraid John Moore was dead; I believe he did tell me that he was afraid John had got off and got tight, that he might have been thrown out of the buggy and got killed." On the same afternoon the defendant said he did not know whether his mother had kept up the $2,000 policy or not, when asked about it. A witness testified that a white shirt with some blood on it was found hanging up in a room of the defendant's home, a day or two after the alleged homicide. The witness afterwards testified that he could not tell whether it was blood or paint. The defendant's house had recently been painted a yellow color. The spot appearing to be paint or blood was about the size of a dollar. The barn on the lot of the defendant was painted red. The defendant was there when it was being painted during the month of the killing, and the paint was gotten from the defendant. The sheriff testified that he arrested Joe Baggett on the 22d of January, and at the time he arrested him the defendant wanted to know why he arrested him, and wanted to go bond for his appearance. He testified that most people want to get their servants out on bond. The defendant seemed anxious to get Joe Baggett out on bond, and stated that he could clear Baggett all right; that he was with him at the time. A. H. Moore, a brother of the deceased, testified that, the morning after the deceased was missing, the defendant told him that he would go and look for his brother after breakfast. The witness replied, "No, I will go," and the defendant then said "No; take your hands and go on to work. After breakfast I will go and look for him." The defendant went, after breakfast, to look for the deceased, and returned about 10 or 11 o'clock. When he returned, he said to the witness, "I haven't found him, nor have I seen any one that's seen anything of him." The defendant said he did not go to the places where he sent his deceased brother,

and the witness said, "Looked like I'd went to them places where you sent him," and the defendant said he had not thought about that. Then the witness said, "Maybe I had better go and hunt for him," and the defendant replied, "No, I will go after dinner and hunt him again." When the defendant and Will Burch returned after dinner, the defendant said, "I have found him over close to Berry Bussey's." Witness asked what was the matter with him, and defendant replied, "He is dead." In reply to a question as to the cause of his death, defendant said, "I don't know exactly. I never got out and examined him. Will Burch will be here directly and will tell you." This witness testified there was a life-insurance policy on the life of the deceased for $2,000 in the Union Central, payable to his mother, and a policy for $3,000 in the Equitable, payable to the defendant. The defendant denied, on Tuesday after the alleged homicide, having any insurance at all except the $2,000 payable to his mother. The witness told the defendant that he knew his mother was not able to pay any premium and never took out any policy on the life of the deceased. This witness further testified that the defendant paid the premiums on the policy; and that the defendant showed him the insurance policy payable to his mother, and said: "Here is the policy. I am going to Augusta to see if I can get some money on it, and hire a detective to see who killed John." It was arranged to bury the deceased at Gibson, but when the witness and the defendant reached that place they ascertained that arrangements had been made for the funeral to occur at a place six miles from Gibson; and the defendant then stated as it was getting late one of them should return to Keysville and assist the sheriff in investigating the killing. He offered to stay and attend the funeral and allow his brother to go back. His brother declined to go back, and the defendant returned from Gibson without attending the funeral. This witness also testified that the firm composed of himself and the defendant began failing to pay its debts after a fire which occurred in October or November of the preceding year. The defendant gave as a reason why he didn't leave deceased in the store and take Will Burch with him after the cows, that Burch was sick, or pretended to be sick. A witness knew Burch didn't work that morning, as he saw Burch lying around the store. The morning after the defendant returned to Keysville with the cows,

he did not seem uneasy. He wanted to go and hunt his brother. He went and stayed about an hour.

The defendant, who introduced no testimony, made a long state-ment, denying any knowledge of the killing, saying that he and the negro Joe Baggett drove the cows to Keysville, and he sent his brother on in the buggy. alone · for the purpose of attending to some business. He went to Augusta after the killing to obtain some money with which to employ a detective, and made a pay-ment for the purpose of having a detective come to Burke county and do some work on the case. He was arrested while in Augusta.

*Henry C. Roney, Isaac S. Peebles Jr.,* and *Phil P. Johnston,* for plaintiff in error. *John C. Hart, attorney-general, J. S. Reynolds, solicitor-general,* and *Brinson & Davis,* contra.

HOLDEN, J. (After stating the foregoing facts.)

1. One assignment of error in the amendment to the motion for a new trial is that the court committed error in permitting the State's counsel to impeach the witness Joe Baggett, by proving by him that he made statements and delivered testimony, prior to the trial, in conflict with the testimony delivered upon the trial. When Joe Baggett was offered as a witness, and before he testified, counsel for the defendant, after the court had retired the witness and the jury, stated to the court, in the presence of opposing coun-sel, that the witness had made to them and others statements in conflict with what he had previously stated to counsel for the State and testified to before the grand jury. In making this statement, counsel related what the witness had told them. The witness was then examined, and the court permitted counsel for the State to impeach him by proving by the witness "prior contradictory state-ments and testimony, and that such prior statement and testimony were untrue." In another assignment of error the defendant com-plains that the court committed error in allowing, over their ob-jections, the testimony of the foreman of the grand jury, "giving in detail the testimony of Joe Baggett delivered before that body." It nowhere appears in either of these assignments of error what was the testimony of the witness Joe Baggett which he said was true, or his testimony of prior contradictory statements and testi-mony. Nor does it appear what was the testimony of the foreman of the grand jury. It is impossible for this court to tell, from the assignments of error, what was any of this testimony; and it has

been repeatedly ruled that under such circumstances such assignments of error can not be considered. *Pearson* v. *Brown,* 105 *Ga.* 802 (31 S. E. 746). The mere statement made by counsel hereinbefore referred to can not be considered as showing what was the testimony of the witnesses; and the testimony of these witnesses not being shown in these assignments of error, either literally or in substance, it is impossible, for obvious reasons, to undertake to say whether or not the court committed error in permitting the witness to be impeached.

2. Counsel for the defendant requested the court to caution, or to permit them to caution, the witness Joe Baggett "that he could not be compelled to answer any question that would tend to criminate him, or subject him to a criminal prosecution; and that should his testimony upon the trial of the case differ materially from his testimony under oath before the grand jury returning the indictment, it would tend to criminate, or subject him to prosecution for perjury." The court declined this request, and its declination is assigned as error. While it is true that the witness can not be compelled to answer any question that would tend to criminate him, he is presumed to know the law, and therefore to know this fact, and it is not reversible error for the court to fail to inform him of the existence of this law, which is designed for the protection of the witness himself, and not for another person who may feel an interest in his testimony. *Dunn* v. *State,* 99 *Ga.* 211 (25 S. E. 448).

3. In the latter part of the charge of the court to the jury, this language was used: "It is now, gentlemen, only about one hour until Sunday; the law does not recognize that any business of a legal character can be transacted on Sunday. When you have reached the hour which by Waynesboro time is 11:32, you will discontinue any further consideration, discussion, or deliberation as to this case until Monday morning." The jury returned their verdict just before the expiration of the hour, the court having remained in session to receive it; and the defendant complains that this charge was calculated to hasten the jury in their consideration of the evidence. The use of the language complained of was not reversible error. It must have been known to the jury that the procedure indicated by the court in his charge was the usual

practice, without the court so stating; and we do not think the making of this statement requires a new trial.

4. The court permitted Dr. J. R. Beall, a witness for the State, to testify concerning certain insurance policies on the life of the deceased, as follows: "The Union Central was for $2,000 made payable to Mrs. Polly Moore as beneficiary; the amount of the other policy was $3,000, and was made payable to Mr. Tom Moore, I think." The ground of the objection was that the policies themselves were the best evidence of their contents, and their absence was not accounted for. The substance of Dr. Beall's testimony on the question of insurance is, that, on Monday morning after the homicide on Wednesday preceding, the defendant stated to him that he wanted him to write a certificate stating that his brother was dead; and that during this conversation the defendant exhibited the policies to the witness, and his testimony as to their contents was from information derived from looking at them at that time. This testimony and other testimony in the record showed that the policies were in the possession of the defendant. After the State proved that the policies were in the possession of the defendant, it had the right to go into secondary evidence of their contents, in the absence of the defendant voluntarily producing the policies, or showing that he did not have them. There is no law in this State which permits the State to require the defendant to produce evidence against himself, and any evidence in the possession of the defendant is, under the laws of this State, inaccessible to the State. If a notice had been served on the defendant to produce the insurance policies, he could have refused to do so, and this refusal on the part of the defendant might have been construed into an admission that he had papers which, if introduced in evidence, would have tended to his injury. Hence, if a notice had been served on the defendant to produce the policies, their production, on the one hand, would have the effect of requiring him to furnish evidence against himself, and, on the other hand, his refusal to produce them would create a presumption unfavorable to him. *Farmer* v. *State,* 100 *Ga.* 41 (28 S. E. 26); *Kinard* v. *State,* 1 *Ga. App.* 146 (58 S. E. 263); *Mahan* v. *State,* 1 *Ga. App.* 534 (58 S. E. 265); U. S. *v.* Doebler, Fed. Cas. 14, 977; State *v.* Gurnee, 14 Kan. 111; U. S. *v.* Reyburn, 6 Pet. 352 (8 U. S. (L. ed.) 424); 2 Enc. Ev. 362; Underhill's Crim. Ev. §42.

5. After the court had permitted counsel for the State to ask Joe Baggett, a witness for the State, leading questions, counsel for the defendant objected to the manner of the State's counsel in examining the witness; whereupon, the court replied, "The court has permitted counsel to ask this witness leading questions, as though he were an unfriendly witness," which statement by the court is assigned as error. The Penal Code, § 1019, provides: "Leading questions are generally allowed in cross-examinations, and only in these; but the court may exercise a discretion in granting the right to the party calling the witness, and in refusing it to the opposite party, when, from the conduct of the witness, or other reason, justice requires it." It being a matter within the discretion of the court to permit the party calling a witness to ask him leading questions, "when, from the conduct of the witness, or other reason, justice requires it," it is not reversible error for the court to state, in the presence of the jury, "The court has permitted counsel to ask this witness leading questions, as though he were an unfriendly witness." The law does not generally permit a party calling a witness to ask him leading questions, and the jury knew that there was some reason for the exercise of the discretion of the court in permitting it in this case. The expression by the court that he would allow leading questions to be propounded to the witness, "as though he were an unfriendly witness," does not mean that the witness was an unfriendly witness, but means that the court would allow leading questions as though he were one. To say that leading questions would be permitted as though a witness were a certain kind of a witness does not mean that the witness is that kind of a witness. The statement by the court, in the presence of the jury, that leading questions would be permitted to be propounded to the witness, just as he would do if he were an unfriendly witness, was not error requiring a new trial.

6. The evidence indicated that the deceased was killed at the place where his body was found, and the evidence that the body was found in Burke county, and other evidence in the case, sufficiently proved the venue.

7. The majority of the court are of the opinion that the evidence was sufficient to authorize the verdict of guilty, which opinion they express as follows: "We deem it unnecessary to enter into a discussion of the testimony to sustain this view. It is suffi-

cient to point to the evidence reported in the statement of facts preceding the opinion. If it is not sufficient to authorize a conviction, and requires a court to upset the verdict, we are of the opinion that it would be difficult to uphold any conviction on circumstantial evidence. Corpus delicti, opportunity, presence near the scene of the crime near the time of its perpetration, motive, unusual acts, conduct inconsistent with innocence and evidencing a guilty conscience, tracks, most extraordinary conduct in sending the deceased to certain places just before the killing, and afterwards searching for him, not at those places, but at others where there was no apparent reason to look, were shown. These facts, and others in evidence, the majority of the court think fully sustain the verdict."

The writer can not concur in the views of the majority of the court that the evidence was sufficient to warrant a conviction. All of the evidence in this case was circumstantial. The deceased was found dead in the country, near a plantation road. Near his body were found the horse and buggy in which he and the defendant and Joe Baggett left the store of the defendant the preceding afternoon. The horse was unhitched, and was tied with one of the buggy-lines to a tree, and the legs of the deceased had been trampled by the horse's forefeet. They were in five or six feet of the road and not far from houses. The witness Joe Baggett testified, that, at a certain place on the road, the deceased was sent off alone in a buggy by the defendant, to attend to some business; that he (Baggett) and the defendant there stopped to attend to a call of nature, and tied the cows to a tree, after which he and the defendant drove the cows on to Keysville, reaching there about 9 o'clock at night. An effort was made by the State to impeach this witness for the State, by proof that he told others, and testified before the grand jury, that the defendant drove down the road in the buggy with the deceased from the point where the cows were tied, and returned alone, warning the witness not to tell that he went off in the buggy with the deceased. It is difficult for the mind to consider this impeaching testimony only for the purpose of discrediting the witness, but it should, of course, be considered only for this purpose. If what the witness testified to as the truth was true, the defendant was not guilty. But, disregarding the testimony of this witness entirely, there is not a fact proved in the case

which is not entirely consistent with the innocence of the defendant. The theory that the deceased was shot while in the buggy is not borne out by the evidence, but the evidence establishes the fact that he was not shot while in the buggy. When the buggy was found the next morning near the body of the deceased, the top was left half-way back, and there was a bullet-hole in the top in this position, which, by reason of its position, was in the back of the buggy above the back of the seat. There was another bullet-hole in the top in the right-hand corner at the bend of the top. All of the wounds on the deceased entered on his right side. One bullet entered on the right side and went through the face or head, and another entered the jaw on the right and came out on the same side. It is not reasonable to suppose that the person shooting the deceased was in the buggy, and that the deceased was sitting in the buggy when he was shot, in view of the fact that he was shot on the right side and one bullet-hole in the buggy-top was in the right-hand corner and the other in the back. The theory that the deceased was not in the buggy when shot is further substantiated by the fact that, notwithstanding several wounds were inflicted on him, there was no blood anywhere in or on the buggy. Moreover, there was no evidence of any blood on the ground except where the deceased was lying when found. The indications are that the deceased was killed while standing on the spot where his body was found. The bullet entering on the right side and going through the face or head, and the bullet entering the jaw on the right and coming out on the same side, were the ones which probably went through the right-hand corner and the back of the top of the buggy, and the buggy must have been not far away at the time, with its front or back almost directly towards the party doing the shooting, and with the deceased between the party doing the shooting and the buggy. Without going into further details, the most reasonable theory to be deduced from the facts proved is that when the deceased was shot he was at the spot where his body was found, and standing between the buggy and the person shooting him, and that the horse was tied at the time of the shooting, and the buggy then standing where they were found the next morning. It would be an unusual thing for two brothers driving along a plantation road at night to drive five or six feet from the road into the woods and unhitch the horse for any

purpose. At any rate, it would be as probable that a person while alone in a buggy along a country road at night would drive from the road and unhitch the horse, as that two brothers would do this. The evidence showed that the deceased drank. There was evidence of tracks near the body, made by a person wearing a No. 6 shoe, and that it was thought that the defendant wore a No. 6 shoe. There was no peculiarity about the track, and the evidence was not very strong to show that it was made by the defendant. The defendant was 22 years old and the deceased 18, and there was no evidence of the size of the shoes worn by the deceased, who might have made this track. Moreover, there was evidence of other tracks made by a No. 12 shoe near the scene of the homicide, that led across a field to and beyond a new and unoccupied house. There was no evidence that any of the bullets which entered or passed through the head or body of the deceased were gotten and compared with the bullets carried by the pistol in possession of the defendant on the occasion in question. Without undertaking to discuss the many details of this evidence, it is sufficient to say that there is not a single fact proved which is inconsistent with the defendant's innocence. Every fact proved in the case can be true and yet the defendant can be innocent. The rule laid down in the case of *Sikes* v. *State,* 120 *Ga.* 494 (48 S. E. 153), is as follows: "The burden is upon the State; and when it relies upon circumstantial evidence to convict a defendant, the proved facts must not only be consistent with the hypothesis of guilt, but inconsistent with the hypothesis of innocence." What fact proved in this case is inconsistent with the hypothesis of the defendant's innocence? In the case cited, of *Williams* v. *State,* 113 *Ga.* 721, 723 (39 S. E. 487), Mr. Chief Justice Simmons, commenting on the rule above announced, says: "This court has ruled on several occasions that, in cases involving life or liberty, this rule must not be relaxed. When a heinous crime has been committed in a community and the people are greatly shocked thereby, it is natural for them to catch at any little circumstance to throw suspicion upon some person and to conclude from this or that circumstance that he is the guilty party. The horror of the crime, and their desire, as good citizens, to see the guilty party punished and the law vindicated, frequently lead them to premature judgment which oftentimes follows them into the jury-box, where, as jurymen, they

22

not infrequently find persons guilty on bare suspicion alone. This is demonstrated by the records of cases passed upon by this court, commencing with the earlier volumes of our reports and continuing almost to the last one. For a reference to some of these cases, see *Bell* v. *State,* 93 *Ga.* 557 (19 S. E. 244). Juries should guard themselves in this respect, and not find verdicts on mere suspicion." Many of the statements made by the defendant, and many of his acts, claimed by the State to be circumstances unfavorable to him, were of slight significance and were but natural under the circumstances. Considering them singly and collectively, and giving to each and all of them the greatest weight they can possibly carry against the defendant, they are not inconsistent with the defendant's innocence. To simply prove circumstances that are consistent with his guilt does not meet the requirements of the law. When the State relies for conviction upon circumstantial evidence, the facts proved must be inconsistent with the innocence of the accused. The evidence in this case does not meet the requirements of this rule of law, and is insufficient to warrant the verdict of guilty. The evidence does not show the defendant's guilt to a moral and reasonable certainty.

However, the contrary view is entertained by the majority of the court, and the judgment of the court below is

*Affirmed. All the Justices concur, except Holden, J., who dissents.*