## RUSSELL *v.* THE STATE.

No. 14562.   JULY 7, 1943.

*William Schley Howard, Devereaux F. McClatchey, Harry S. McCowen,* and *William K. Meadow,* for plaintiff in error.

*T. Grady Head, attorney-general, John A. Boykin, solicitor-general, E. E. Andrews, J. R. Parham, Durwood T. Pye,* and *L. C. Groves, assistant attorney-general,* contra.

REID, Chief Justice.   The plaintiff in error excepted to the overruling of his motion for new trial after his conviction and death sentence for the murder of George H. A. Thomas.   The facts of the case necessary to be stated in order to give an understanding of the rulings which will be made upon the grounds of the motion for new trial are substantially as follows.   Thomas was manager of Black Rock Golf Club located on Campbellton Road near Atlanta in Fulton County.   On November 23, 1942, he was spending the night alone in living quarters which he maintained at the club-house.   On the morning of November 24 it developed upon the arrival of employees of the club that he was missing and unaccounted for.   It

appeared a robbery had been committed during the night. About the club-rooms near his bedroom certain money and property of the club had been taken; also certain baggage, clothing, and personal belongings of the deceased were missing, including a pistol which he had customarily kept at the head of his bed. Mr. Thomas's Plymouth automobile was also missing. Behind a counter in an adjacent room blood was found on the floor, and a towel with bloodstains was located near by. County police authorities were notified, and a search was begun for Thomas. During the day his body was found at a point in the woods near the golf course about three quarters of a mile from the club-house. He had been shot through the neck with his jugular vein severed, and had been dead for several hours, perhaps as much as twenty-four or more. He was dressed in his night clothes, bathrobe, and house slippers. Two days later certain county officers apprehended the defendant Russell, who had been a former employee of Mr. Thomas and had served as a caddy at the golf club. He was found in a restaurant on McDaniel Street in Atlanta. Apparently suspecting him of guilt, the officers inquired of him where he got a watch which was in his possession, and he said it was his. The officer stated to him, "No, Bubber, that's Mr. Thomas's watch. Now where is the other stuff and the car." To this the defendant replied, "Well, you have got me. I will take you where the car and the other stuff is." Whereupon, in company with the defendant directing them, they went to a point near Fort Street and Edgewood Avenue, where Thomas's car was found parked. The officers inquired of the defendant where the key was, and he said he would get it at the Savoy Hotel. He accompanied them to a room at that hotel where they found most of the property which had been stolen, including the pistol; and the defendant, who was registered in this room under the name of Joe Wilson, went to a dresser drawer and picked up the keys to the car from under a paper. The officer testified, "He said he got it at the club-house, and we found all those articles there on the table, the shoes, shirts, golf bag," three hundred and thirty-nine golf balls, eight or nine cartons of cigarettes, a radio, etc. The officers also took from the person of the defendant a knife which he stated belonged to Mr. Thomas and which he had taken from Mr. Thomas's trousers. The defendant, according to the evidence, discussed the robbery with the officers without any pressure or urging

from them. From the hotel, immediately after gathering up the articles mentioned, he was taken by the officers to the office of the chief of county police, Mathieson, in the court-house. The number of officers accompanying him is not stated in the record, but it appears after they were assembled in Chief Mathieson's office five officers were present. Baker, a county policeman, who had participated in the investigation at the time and who had known both the deceased and the defendant, testified that he took the defendant into the court-house, and either on the way into the court-house or after arrival in Chief Mathieson's office the defendant made a statement to him. Baker testified, "I told him, I said, 'Bubber, you have killed one of the best friends I ever had.' I said, 'Who did you have with you,' and he said, 'No one,' and I said, 'I can't believe you committed this crime alone,' and he said, 'I knew Mr. Thomas's condition, and I knew I could handle him, and I didn't want any help.' That statement was freely and voluntarily made. There was no offer of reward, and no threat, and no intimidation, to induce him to make that statement." Then appeared in the office, apparently in response to a call from the officers present, Mr. Andrews, the assistant solicitor-general, and one of the official reporters of Fulton superior court. On the trial the court reporter was offered as a witness by the State, and he testified that the defendant was in the room with Chief Mathieson when he arrived, and that the defendant then made a statement in response to questions asked him by the assistant solicitor-general. The court reporter recorded it in shorthand by questions and answers, later transcribing them; and a transcript of them was sworn to by defendant Russell. At the trial the reporter identified this transcript. He testified that the defendant was told, before he was questioned, that any answer he might give would be used against him, and was cautioned that he had the constitutional right to refuse to answer; and that the answers to the various questions were made freely and voluntarily. The beginning of the examination by the solicitor-general is reported as follows: "Q. What is your name? A. My full name? Q. Your name. A. John Thomas Russell. Q. John, I am assistant solicitor-general. . . A. Yes, sir. Q. Under the constitution nobody can make you make any statement you don't want to make. A. Well, I know that. Q. But any statement you do make will be used against you. A. That is all right.

Q. If you want to tell me what happened in the club-house, I am going to ask you some questions, but you can answer or not as you see fit. A. Yes, sir." From that point the assistant solicitor proceeded with an examination of the defendant, inquiring in considerable detail as to the movements and activities of the defendant from the time just before the robbery and killing of Thomas until the time of his being taken in custody by the officers. In response to these questions the defendant gave a detailed story of how, about seven o'clock in the evening of the alleged murder, he boarded a bus and went to the golf club, alighting from the bus about a block from the entrance to the club, and of how he continued from that point on. The statement was very lengthy and contained a great many details not necessary here to be stated. The substance of the pertinent portion was as follows: He went to the club-house entrance, found it closed, knocked on the door. Mr. Thomas came to the door, dressed. He inquired of "Bubber" what he was doing there at that time of night, and asked him if he wasn't drunk. "Bubber" explained, "No, I have just had a couple of beers." Mr. Thomas invited him in, and asked him what he wanted to talk about. He explained that he wanted a recommendation, that he had the prospect of employment and needed a recommendation. Thomas, looking for pen and paper, turned away, and "Bubber" then said to Thomas that he wanted to borrow $20. There was some discussion about that; and Thomas, not having agreed to lend him the $20, started back of a counter for some purpose, and Russell grabbed him and hit him "somewhere in the face," and Thomas started bleeding. Russell protested to Thomas that he had not meant to hurt him, but that he had to have the money. They then went to a safe, Thomas wiping off his wound with a towel, and Thomas opened the safe by working the combination, having in the meantime agreed to produce the money. After the safe was opened and the money produced (less than $100, all in silver) Russell protested that he would take the money and leave, and would not hurt Thomas. Later, however, he forced him to open the cash register. Then Russell asked him about his car keys. They were produced from Thomas's trousers pocket in his bedroom. The defendant described the conditions in the bedroom as they had been found to be the morning after the robbery. He said he found Thomas's pistol lying on a table, and took it and said to Thomas, "Come on,"

Thomas begging him to take the money and leave, and he protesting to Thomas that he did not intend to hurt him. He then took hold of Thomas and led him down the steps on the outside of the club-house, and continued to lead him along a road which was either on or near the golf course to a point where they turned into the woods. He outlined considerable conversation that took place between them during this fateful journey. According to the story, he turned into the woods and went some distance holding to Thomas's arm and holding the pistol in his left hand. He then explained that he was intending to tie Mr. Thomas up with a towel which he had carried with him, so that he could get away. He said: "Standing by the tree I had the towel I got in his room. I had it in my back pocket. I went to reach for the towel with my right hand, and he grabbed hold of the gun; . . he was standing by the tree." Russell then stated that as he reached for the towel he got into a tussle with Thomas over the gun, and the gun discharged hitting Thomas; and that Thomas fell and said, "Lord, have mercy, Bubber, I didn't know you would do that." The gun was discharged three times. Russell then returned to the club-house, gathered up the items referred to as having been stolen, including a bottle of gin, placed them in suit-cases belonging to the deceased, took the car and drove to the Savoy Hotel where he registered and where the stolen goods were found. He further detailed his activities from that time until he was apprehended, spending a considerable portion of the time drinking at restaurants and other places about the city. Toward the conclusion of the examination by the assistant solicitor the question was asked the defendant, "Have you told us here in the presence of Mr. Echols, the court reporter, the truth about what happened? A. That is the truth, sir. Q. Now, are you making this statement of your own free will because you want to? A. If I don't, I take credit from the good Lord. Q. Will you take oath and swear to it? A. I will curse God if it isn't true." Other questions were propounded. The solicitor: "You don't have to swear to this statement unless you want to. Nobody can make you do it. I told you that any statement you make will be used against you." The accused: "I will swear to it." An oath was then administered to him. Two days after a transcript of it had been made the court reporter and an officer took the statement to him at the jail. Although he insisted

he did not care to have it read, it was fully read to him, and except for suggesting the correction · of the name of a street he said "That's all right," and signed it. When this statement or transcript, having thus been identified, was offered in evidence, there was no objection to its admission, and it was read in full to the jury, including the oath which appeared at its conclusion. John T. Carter, a county policeman, testified that the defendant told him he had fired the pistol three times. "He said that the gun was fired in a struggle over it, that Mr. Thomas grabbed it, and they scuffled, and that the last shot hit him. . . He said that he had him by the arm and had the gun in his left hand and that Mr. Thomas was on his right. He said that he was going to tie him up, but that he had the gun in this hand and turned Mr. Thomas loose and reached to get a towel, and Mr. Thomas grabbed the gun." It was a single-action pistol, and could not be fired without being cocked by the trigger. There were no powder burns on the body of the deceased. Proof of the corpus delicti was made, with other details not necessary to be stated here, or referred to in the opinion.

During the trial, on the day following the introduction of the defendant's examination as conducted by the assistant solicitor-general, counsel for the defendant stated to the court: "Yesterday the State introduced in evidence the statement number 10, a thirty-page typewritten statement in question and answer form signed by the defendant. We didn't object at the time, but now at this time we do wish to object and move to rule it out, on the following grounds: The law of Georgia provides that the defendant in a criminal case shall not be sworn and is not subject to cross-examination. This statement which is in evidence and was read to the jury, while objection was not made at the time it was offered, still it is a contention of the defendant that by putting him under oath and questioning him at length as was done in this case, and then introducing that statement in evidence at his trial, seeks to avoid the law which provides that the defendant shall not be subject to cross-examination or sworn. On those grounds we move to rule out that statement which was admitted yesterday." Whereupon counsel for the State pointed out to the court that the defendant was not sworn before he was examined, and that answers to questions by him were not actually made by him under oath, but that the oath was subse-

quently administered to him, and at the same time proposed to withdraw from the jury that part of the statement which included the oath. The motion to exclude the statement in its entirety was overruled, and the solicitor was permitted to withdraw "the last part which shows that he did swear to the statement and that part of the statement which would show to the jury that he did swear to the statement," including the signature. Under direction of the court that part of the statement as it appeared was so covered that it could not be seen by the jury. At this point counsel for defendant moved that a mistrial be declared, on the ground that the part of the statement, including the oath later withdrawn, had been read in the presence of the jury. This motion was overruled. The defendant offered no evidence except his statement as follows: "These gentlemen have told you how Mr. Thomas met his death. They have told you, as near as I can remember, everything I told them. It is the truth as far as any one, as much as any one inflamed by liquor, could tell anything. God knows when I went to see him that night I went to get a recommendation from him and borrow some money to get me some work clothes with." Continuing, he outlined his activities, or some of them, as they transpired while they were in the club-house, all of which, except his claim that he had been drinking at the time, conformed to or was consistent with those conditions related by him to the assistant solicitor-general. He claimed he did not intend to hurt Thomas, and that "it was due to drinking so much liquor and beer that I don't know what I was doing," protesting that Thomas had been his friend and that he liked Thomas. "So . . I know I didn't go there to hurt him. I would not have done it for nothing if I had been at myself. So I remember that I was to tie him up on the golf course after I came to myself and saw what I had done, so I could get away. . . When I reached for the towel he grabbed for the pistol, and we started tussling over the pistol, and it went off; and that's the way he got shot. After I came to myself I was so excited I didn't know what to do. The first thing I thought of was to get away, and the next thing was to come and give up to the law, so I don't know." After other recitals, the statement concluded: "And all I can do now is ask you for mercy and to spare my life."

■ Grounds 1, 2, 3, and 4 of the amendment to the motion for new trial relate to admission and explanation of certain photo-

graphs of the body of the deceased as it was found lying i the woods, and photographs of the inside of the premises at the golf club where the robbery had taken place. All of these photographs were explained as representing either the scene of the premises when the robbery was first discovered, or as representing the position of the body of the deceased at the time it was discovered; and certain of the photographs showing the nature of the wound received by the deceased, the clothing worn by him, etc. There was no error in their admission over the objection that they tended to inflame the mind of the jury. The nature of the wound was important, because of the issue growing out of how the shot was fired, i. e., whether in a struggle over the gun or otherwise, and these photographs with accompanying explanation were properly admitted. See *Franklin* v. *State,* 69 *Ga.* 36 (47 Am. R. 748). The same is true of those photographs showing the position of the body of the deceased and its condition when found, as illustrative of the surroundings at the time of the homicide. *Butler* v. *State,* 142 *Ga.* 286 (9) (82 S. E. 654). The scene at the place of the robbery was important as corroborative of the alleged confession of the defendant and as illustrative of one of the steps connected with the alleged crime of murder with which the defendant stood charged. See cases already cited, and *Johnson* v. *State,* 158 *Ga.* 192 (123 S. E. 120) ; *Shafer* v. *State,* 193 *Ga.* 748 (7) (20 S. E. 2d, 34). No error is found in any of these grounds.

■ Ground 5 complains of a refusal by the court to exclude from evidence the transcript of the statement given by the defendant, under questioning of the assistant solicitor-general, to the court reporter, it having been previously admitted without objection. The basis for its exclusion as urged at the trial was that it violated that provision of law embodied in the Code, § 38-415, as follows: "In all criminal trials, the prisoner shall have the right to make to the court and jury such statement in the case as he may deem proper in his defense. It shall not be under oath, and shall have such force only as the jury may think right to give it. They may believe it in preference to the sworn testimony in the case. The prisoner shall not be compelled to answer any questions on cross-examination, should he think proper." It is contended that since the transcript shows that the defendant was examined as if he were a witness, and since he took an oath to the truthfulness of his statement,

all of which was permitted to go to the jury, the provisions of this section were circumvented, and that the defendant was thus compelled to give incriminatory testimony against himself. See constitutional provision (Code, § 2-106) which is that "No person shall be compelled to give testimony tending in any manner to criminate himself." The test for the admission of confession of crime in this State is declared by § 38-411, as follows: "To make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury." In *Bryant* v. *State,* 191 *Ga.* 686 (13 S. E. 2d, 820), it was held: " 'To make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury.' Code, § 38-411. Before an alleged confession or incriminatory statement can properly be admitted in evidence, there must be a prima facie showing made by the State or elicited by the court that it was freely and voluntarily made, without hope of reward or fear of punishment. If such preliminary proof fails to meet the requirements of the statute, it is the duty of the court to exclude the confession from evidence. Where such proper preliminary proof has been made, the confession or incriminatory statement becomes admissible; but the defendant is privileged to attack such showing by proof that the confession or incriminatory statement was not voluntary or was made with hope of benefit or fear of injury. In that event, the question as to the voluntary character of the confession becomes one for the jury." The Code does not undertake to specify to whom it must have been made, in order to render it admissible against the accused, or under what circumstances. The test is, was it freely and voluntarily made? This seems to be the exclusive test that runs through all of the decisions we have examined on the subject. The fact that a confession or incriminating admission may have been made while the defendant was in custody of officers will not of itself justify its exclusion. *Fuller* v. *State,* 109 *Ga.* 809 (35 S. E. 298) ; *Whitworth* v. *State,* 155 *Ga.* 395 (2) 400 (117 S. E. 450). It was held in *Riley* v. *State,* 180 *Ga.* 869 (2) (181 S. E. 154), that "A confession reduced to writing and sworn to by accused is admissible in evidence, when made freely and voluntarily." In that case, as in the one now under consideration, the statement of the defendant was made before any oath had

been administered. Authorities were cited for the proposition that such a confession was not rendered inadmissible by the mere fact that it was sworn to. This ruling was followed in *Mincey* v. *State,* 187 *Ga.* 281 (200 S. E. 144). In *Claybourn* v. *State,* 190 *Ga.* 861, 866 (11 S. E. 2d, 23), the accused was in the custody of arresting officers, and after being urged to tell the truth he stated to the officer: "I guess I'll tell you the truth. I didn't kill Dr. Lee, but I know something about it." Following this, in company with the officers the accused went to another town; and the solicitor-general, having been informed of his statement, warned him of the consequences of making any statement or confession, and then proceeded to receive from him a complete confession of the crime. It further appeared that he had been questioned at length by the officers who had told him at various times that they knew he was lying and knew of his guilt. While not approving the practice there shown to have been adopted, this court held that the confession made to the solicitor-general was not shown to have been influenced, and approved its admission as having been made without fear of injury or hope of reward, applying again the test whether or not it was made "freely and voluntarily," and citing an exhaustive collection of cases which have consistently adhered to that principle. Counsel for the plaintiff in error have cited *Adams* v. *State,* 129 *Ga.* 248 (58 S. E. 822, 17 L. R. A. (N. S.) 468, 12 Ann. Cas. 158), where the following ruling was made: "Where the body of a man apparently murdered was found by the roadside, and two persons were arrested and placed in jail charged with the murder, and were subsequently taken thence in custody before the coroner's jury summoned to hold an inquest on the body, and, without being informed that they were not compelled to testify, were sworn and examined as witnesses, not on their motion but on that of the coroner or the jury, in regard to the homicide and their connection with it, on a subsequent trial under an indictment charging them with murder, confessions or inculpatory statements elicited on their examination before the coroner's jury were not admissible against them." It is not contended by counsel that this ruling is controlling in the present case, but it is urged that it states principles which, if here properly applied, would call for a ruling that the confession in the instant case should have been excluded. We find nothing in that case to support the position of the plaintiff in error. On the contrary, in the opinion

are to be found stated the principles above announced. The two persons in custody were called to appear at a coroner's inquiry, and, without being told that they were not compelled to testify, "were sworn and examined as witnesses." In *Cicero* v. *State*, 54 *Ga.* 156, it was held that a committing magistrate had no right to examine the defendant for the purpose of entrapping him, and that statements made as a result of such examination could not thereafter be used against such defendant; but all of these cases definitely affirm and illustrate the rule that the whole object on this score in the administration of criminal justice in this State is to protect the accused from being *forced* to testify against himself. Our attention has also been called to the recent case of McNabb, 318 U. S. 332 (63 Sup. Ct. 608, 87 L. ed. 579), as helpful to the plaintiff in error. Although not binding upon us in such a case as now under consideration, we have carefully examined that decision. The prosecution there involved was under Federal law in the Federal courts; and at the outset of the opinion Mr. Justice Frankfurter said: "We brought the case here because the petition for certiorari presented serious questions in the administration of Federal criminal justice," although the defendants who had been convicted of the killing of a Federal officer claimed to have been denied due process under the United States constitution. The prisoners in that case had not been taken before a United States commissioner, as required by Federal law, had been held for about fourteen hours, confined in a cell, given only small amounts of food, and were shown to be without experience and entirely ignorant. They were subjected to a grueling examination for more than two days; and in addition to this, at the time of their trial their counsel moved to exclude their confessions thus obtained, and sought to show that they had not been freely and voluntarily made, but that they had been made under coercion; and finally under those circumstances the opinion in the case, which held that the confessions were improperly admitted, did not put the holding upon the ground of coercion, but, as pointed out by Mr. Justice Reed in his dissenting opinion, "Now the court leaves undecided whether the present confessions are voluntary or involuntary, and declares that the confession must be excluded because, in addition to questioning the petitioners, the arresting officers failed promptly to take them before a committing magistrate. The court finds a basis for the dec-

laration of this new rule of evidence in its supervisory authority over the administration of criminal justice." The dissenting Justice, as was true in our case of *Claybourn* v. *State,* supra, found nothing wrong with mere questioning of an accused while in custody, and preferred as the most reliable "the test of the voluntary character of the confession."

In the case now before us there is no evidence of any force or even of persuasion brought to bear on the defendant with reference to the statement made to the solicitor-general, or to any of the other statements attributed to him. We have very carefully examined the entire transcript of the assistant solicitor-general's examination, and find in it no note of hostility, or threat, or argument with the accused on the one hand, nor do we find any such thing as a leading question or suggestion by him on the other hand. The accused answered the question most freely, if we are to judge from the nature of what he said. While the examination of him was exhaustive in so far as detail was concerned, this, so far as we can determine, related only to the matter of thoroughness. Even at the time the motion was made to exclude the confession, it was not offered to prove or even contended that any force, threats, coercion, or reward might have been involved in procuring the statement. Then, to go a step further, the defendant, while having the full advice of counsel and the protection of the court, the full benefit of reflection while awaiting trial, and the benefit of the events of the trial itself, not only stated that the contents of the confession were true so far as he remembered, but repeated a considerable portion of the statement in conformity to what had been given to the court reporter under the questioning of the assistant solicitor-general. There is no suggestion in the record that the defendant was either ignorant or laboring under any fear. While this court has been most zealous in application of the rule that the confession to be admitted must have been freely and voluntarily made, we can find nothing in the present record but support for the circumspect care thrown about the prisoner; and the basis of this ground of the motion can not be accepted.

What has been said is without reference to the claim on the part of the State that other incriminating statements and confessions which are not here under attack were made to the officers having the accused in custody.

■ The complaint made in ground 6 relates to the refusal of the court to declare a mistrial because the oath and signature of the defendant had been permitted, while before the court without objection, to be presented to the jury. As a matter of record the court instructed the jury that this portion of the statement had been withdrawn, and that no consideration should be given to it; but in any event it follows from what has been ruled in the foregoing division of this opinion that the complaint made in this ground is without merit.

■ In ground 7 complaint is made that the court in response to a request, having given in charge the law of involuntary manslaughter, failed to charge the jury what the penalty or punishment was for this crime, although the omitted charge was not embraced in counsel's request. Without intimating whether involuntary manslaughter might have been involved in the case, so as to require a charge on the subject to be given, since the jury in the verdict had the choice, under the law and the charge of the court, of fixing a sentence of either death or life imprisonment, and since they did not elect to reduce the sentence to life imprisonment, it seems, without regard to the merit of criticism in this ground, that the defendant could not have been harmed by such failure.

■ Ground 8 complains of the refusal by the court of a request to give the following in charge: "A person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design, or intention, or culpable neglect. I therefore charge you further that if you should find from the evidence in this case, including the defendant's statement, that he killed the person charged in the indictment, but that he did so by accident and with no intention so to do, it would be your duty to find him not guilty. I further charge you that if you have a reasonable doubt as to whether the killing was voluntary or accidental, it is your duty to give the defendant the benefit of the doubt and acquit him." The first sentence in this request was given in charge, and the complaint relates to the refusal to give the entire requested instruction. There was no error in so refusing. Under all of the evidence and the defendant's statement, the killing occurred in connection with and as one of the "incidental probable consequences" of the robbery in which the defendant was at the time engaged. His own statement

was that the deceased was shot in struggling over the gun while he was trying to tie him up so that the defendant could get away. *Gore* v. *State,* 162 *Ga.* 267 (1*a*) (134 S. E. 36) ; *Berryhill* v. *State,* 151 *Ga.* 416 (107 S. E. 158) ; *Lumpkin* v. *State,* 176 *Ga.* 446, 449 (168 S. E. 241).

No error appearing on any of the contentions made by the plaintiff in error, the judgment must be

*Affirmed. All the Justices concur.*