305 Ga. 758
FINAL COPY

S19A0157. THE STATE v. TURNQUEST.

PETERSON, Justice.

This is another DUI case requiring us to consider the meaning of the Georgia Constitution. In <u>Miranda v. Arizona</u>, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), the United States Supreme Court imposed on law enforcement a requirement to provide persons in custody with a prophylactic warning of their rights before subjecting those persons to interrogation. Today we hold that neither the Georgia right against compelled self-incrimination, the Georgia right to due process, nor a Georgia statute prohibiting compelled self-incrimination requires law enforcement to provide similar warnings to persons arrested for DUI before asking them to submit to a breath test.

In 2017, we reiterated that the Georgia Constitution's right against compelled self-incrimination is broader in one sense than the similar right protected by the United States Constitution; the

Georgia right prohibits the compulsion of incriminating acts and testimony, while the federal right prohibits only the compulsion of testimony. See <u>Olevik v. State</u>, 302 Ga. 228, 235-246 (2) (c) (806 SE2d 505) (2017). That holding was based on the language, history, and context of Georgia's Constitution. Id. And earlier this year, we held that the Georgia Constitution's right against compelled self-incrimination prohibits the State from introducing evidence of a defendant's exercise of that right; the federal right is similar in its exclusion of evidence of a defendant's exercise. See <u>Elliott v. State</u>, 305 Ga. 179, 210 (IV) (824 SE2d 265) (2019). But our holding in <u>Elliott</u> was not based on federal precedent, which we found unpersuasive; instead, our conclusion was again based on the language, history, and context of Georgia's Constitution. Id. Today, we are asked to apply those opinions to conclude that a Georgia statute — OCGA § 24-5-506 — and the Georgia Constitution require law enforcement to give <u>Miranda</u>-like warnings (an argument presented because <u>Miranda</u> itself does not apply). After again reviewing the language, history, and context of the Georgia

Constitution, we reject that invitation. Nothing in the Georgia Constitution or OCGA § 24-5-506 requires Miranda-style prophylactic warnings before a suspect in custody is asked to submit to a breath test.

In Price v. State, 269 Ga. 222 (498 SE2d 262) (1998), we held that the failure to give the appellant "Miranda warnings" rendered evidence regarding field sobriety tests inadmissible because the appellant was in custody when asked to perform the tests. 269 Ga. at 225 (3). But that case was wrongly decided, and because stare decisis considerations do not warrant retaining that precedent to the extent that it is contrary to our conclusion about the meaning of the Georgia Constitution and OCGA § 24-5-506, we vacate the trial court's order suppressing breath-test results for failure to give Miranda warnings. We remand for the trial court to consider an argument not ruled on below.

1. *Facts*.

The parties stipulated to the following facts. In March 2017, defendant Stephen Turnquest was involved in a single-vehicle

accident. The responding officer arrested Turnquest for DUI. After arresting Turnquest and before asking him to submit to a breath test, the officer read the age-appropriate Georgia implied consent notice pursuant to OCGA § 40-5-67.1 (b) (2) but did not give Miranda warnings. Turnquest provided a breath sample.

Turnquest was charged with DUI less safe, DUI per se, and failure to maintain lane. He filed a motion to exclude the results of the breath test on essentially two grounds. First, Turnquest argued that Miranda warnings must precede a request to perform a chemical breath test because, as we held in Olevik, submitting to a breath test is an incriminating act that the right against compelled self-incrimination, secured by Article I, Section I, Paragraph XVI of the Georgia Constitution of 1983 ("Paragraph XVI"), prevents the State from compelling.[1] Second, Turnquest argued that the test results should be suppressed because the implied consent

_____

[1] As in *Olevik*, the breath test at issue here requires the cooperation of the person being tested because a suspect must blow deeply into a breathalyzer for several seconds in order to produce an adequate sample. See Olevik, 302 Ga. at 243 (citing Birchfield v. North Dakota, __ U. S. __, __ (136 SCt 2160, 195 LE2d 560) (2016)).

advisement misled him by stating that if he refused the test, that refusal could be used against him at trial and could affect his driving privileges. The trial court granted the motion on the basis that Miranda warnings must precede an officer's request for a breath sample from a suspect in custody. In reaching this conclusion, the trial court relied on Paragraph XVI, OCGA § 24-5-506 (a) (formerly OCGA § 24-9-20), and our decision in Price, as well as several Georgia appellate decisions that we relied on in Price. The State appealed under OCGA § 5-7-1 (a) (4), asking us to overrule Price.

2. *Miranda itself does not require suspects in custody to be warned of their constitutional rights before they are asked to submit to a breath test.*

Although Turnquest argues that he was entitled to Miranda warnings, he cannot, and does not, rely on Miranda itself for his argument that the results of his breath test must be suppressed. Miranda provides — at least in part as a matter of "safeguard[ing] . . . the privilege against self-incrimination" as embodied in the Fifth Amendment to the United States Constitution — that the prosecution may not use any statements stemming from custodial

interrogation of the defendant unless the defendant is first informed of certain rights. 384 U. S. at 444. Specifically, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. <u>Miranda</u> does not apply to a request for a breath test, however, because affirmative acts such as submitting to a breath test do not fall within the reach of the right against compelled self-incrimination protected by the Fifth Amendment. See <u>United States v. Wade</u>, 388 U. S. 218, 221-223 (87 SCt 1926, 18 LE2d 1149) (1967); <u>Holt v. United States</u>, 218 U. S. 245, 252-253 (31 SCt 2, 54 LE 1021) (1910); see also <u>Schmerber v. California</u>, 384 U. S. 757, 760-765 (86 SCt 1826, 16 LE2d 908) (1966).

3. *Neither the Georgia Constitution nor OCGA § 24-5-506 requires suspects in custody to be warned of any constitutional rights before they are asked to submit to a breath test.*

Turnquest's argument thus turns on whether some aspect of *Georgia* law requires law enforcement to give a suspect in custody <u>Miranda</u>-like warnings before asking the suspect to consent to a

breath test. We consider several possible Georgia law sources for such a requirement. Turnquest explicitly relies on Paragraph XVI in support of his argument that warnings were required. We also consider the due process provision of the Georgia Constitution, found at Article I, Section, I, Paragraph I of the Georgia Constitution of 1983 ("Paragraph I"), given that due process also is implicated in questions of whether incriminating statements or acts were constitutionally acquired by law enforcement and may be at least one basis for the Miranda rule. See Dickerson v. United States, 530 U. S. 428, 433 (120 SCt 2326, 147 LE2d 405) (2000) ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."). And the trial court relied at least in part on former OCGA § 24-9-20 (a), now OCGA § 24-5-506 (a), so we consider that statute as a possible source, as well. We ultimately conclude that none of these provisions of Georgia law

require law enforcement to warn persons in custody of any constitutional rights before asking them to submit to a breath test.

(a) *Paragraph XVI does not require that a suspect be warned of his right against compelled self-incrimination or any other constitutional rights before being asked to submit to a breath test.*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" Finding that some compulsion is inherent whenever a suspect is being subjected to custodial interrogation, the United States Supreme Court in <u>Miranda</u> imposed a prophylactic rule that, before a suspect in custody can be questioned, he must be advised of certain constitutional rights, including the right to remain silent. 384 U. S. at 467-472. But

> Georgia constitutional provisions may confer greater, fewer, or the same rights as similar provisions of the United States Constitution, and decisions of the United States Supreme Court interpreting those similar provisions are persuasive in our interpretation of the Georgia Constitution only to the extent that those decisions are rooted in shared history, language, and context.

Elliott, 305 Ga. at 187 (II) (C); see also Olevik, 302 Ga. at 234 (2) (b) n.3. It is not entirely clear that Miranda constituted an interpretation of any particular federal constitutional provision or provisions. But even to the extent that Miranda was a construction of one or more federal analogues to provisions found in the Georgia Constitution, it certainly involved no consideration of shared language, history, or context. And so Miranda and its progeny offer us no meaningful guidance as to whether Paragraph XVI of the Georgia Constitution independently requires warnings like those set forth in Miranda.

"[W]e interpret the Georgia Constitution according to its original public meaning." Elliott, 305 Ga. at 181 (II). To determine a provision's original public meaning, we must consider the language, history, and context of that provision. Id. at 188 (II) (C). Because Paragraph XVI has been carried forward without material change since it first entered a Georgia Constitution in 1877 (the "1877 Provision"), we presume, absent some indication to the contrary, that it has retained the original public meaning it had in 1877. Id.

at 183 (II) (A). Thus, we begin by examining the language, history, and context of the 1877 Provision.

(i) *Nothing in the language, history, and context of the 1877 Provision indicates that it required a suspect to be warned of his right against compelled self-incrimination or any other constitutional rights before being questioned or asked to perform an incriminating act.*

The 1877 Provision provided, "No person shall be compelled to give testimony tending in any manner to criminate himself." Ga. Const. of 1877, Art. I, Sec. I, Par. VI.[2] At the time of the 1877 Constitution, the term "compel" was defined as "[t]o drive or urge irresistibly" or "[t]o take by force." Noah Webster, A Dictionary of the English Language 80 (1878).[3] The failure of an investigating officer to apprise a suspect of any constitutional rights, without more, does not render a subsequent incriminating act by the suspect "compelled" within the ordinary sense of that word, which carries

---

[2] Our current Paragraph XVI provides, "No person shall be compelled to give testimony tending in any manner to be self-incriminating." Ga. Const. of 1983, Art. I, Sec. I, Par. XVI.

[3] A dictionary more contemporaneous with the 1983 Constitution similarly defined "compel" as to "constrain" or "force" a person to do something. Webster's New World Dictionary 289 (2d College ed. 1980).

with it a connotation of involuntariness. Even in reaffirming the Miranda rule, the United States Supreme Court has acknowledged that failure to warn a suspect of any constitutional rights does not render a subsequent statement "involuntary" in that term's traditional sense. See Dickerson, 530 U. S. at 444 ("The disadvantage of the Miranda rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result.").[4] The language of the 1877 Provision does not support a conclusion that the provision required a suspect to be warned of the right against compelled self-incrimination or any other

---

[4] This acknowledgment seems at odds with the Miranda Court's attempt to root its ruling in the language of the Fifth Amendment, which like Paragraph XVI forbids self-incrimination only if "compelled," by insisting that because of the "compulsion inherent in custodial surroundings, no statement obtained from [a] defendant [in custody] can truly be the product of his free choice" absent the use of adequate prophylaxis such as Miranda warnings. 384 U. S. at 458; see also id. at 531 (White, J., joined by Harlan and Stewart, JJ., dissenting) ("[T]he Court's holding today is neither compelled nor even strongly suggested by the language of the Fifth Amendment[.]"); Edwards v. Arizona, 451 U. S. 477, 491-492 (101 SCt 1880, 68 LE2d 378) (1981) (Powell, J., joined by Rehnquist, J., concurring) ("[T]he Court in Miranda . . . imposed a general prophylactic rule that is not manifestly required by anything in the text of the Constitution.").

constitutional rights in order for a custodial statement to be admissible.

The history and context of the 1877 Provision also do not support a conclusion that it requires custodial statements to be preceded by warnings of constitutional rights. "For context, we may look to the broader context in which [the] text was enacted, including other law — constitutional, statutory, decisional, and common law alike — that forms the legal background of the constitutional provision." Elliott, 305 Ga. at 187 (II) (B) (citation and punctuation omitted). "Where, as here, a constitutional provision incorporates a pre-existing right, the provision cannot be said to create that right — it merely secures and protects it." Id. at 212 (IV) (B). "And where the right enshrined in the constitution was one found at common law, that constitutional right is understood with reference to the common law, absent some clear textual indication to the contrary." Id. In particular, the Georgia General Assembly in 1784 adopted the statutes and common law of England as of May 14, 1776. See Cobb's

Digest, p. 721 (1851); OCGA § 1-1-10 (c) (1) (maintaining adoption of English statutory and common law).

Turnquest concedes that English common law did not require a suspect in custody to be warned of any constitutional rights. And we have found no evidence that English common law as of 1776 required as much. A practice of warning suspects of their rights before questioning apparently began to develop in England or the United States around the turn of the 19th century at the earliest. See Wesley MacNeil Oliver, Magistrates' Examinations, Police Interrogations, and Miranda-Like Warnings in the Nineteenth Century, 81 Tul. L. Rev. 777, 784-789 (2007) ("The first person ever to inform a criminal defendant he had the right to remain silent and anything he said could be used against him was likely an English magistrate conducting a preliminary hearing around the turn of the nineteenth century."). But this development did not reflect an understanding that the common law right against compelled self-incrimination — or any other common law right — *required* such warnings; rather, it was likely an attempt to insulate confessions

from exclusion on the basis that they were the product of a threat or promise. Id.

To explain further: American magistrates conducted much of the questioning of arrestees until the mid-1800s, a pretrial procedure borrowed from British statutes. See Wesley MacNeil Oliver, The Neglected History of Criminal Procedure, 1850-1940, 62 Rutgers L. Rev. 447, 454-455 (2010); Akhil Reed Amar & Renee B. Lettow, Fifth Amendment First Principles: The Self-Incrimination Clause, 93 Mich. L. Rev. 857, 897-898 (1995); Eben Moglen, Taking the Fifth: Reconsidering the Origins of the Constitutional Privilege Against Self-Incrimination, 92 Mich. L. Rev. 1086, 1095 (1994). As the 18th century drew to a close, English and American courts increasingly excluded statements as improperly induced by threats or promises. Oliver, 81 Tul. L. Rev. at 786-789. Although it is not clear that the practice was widespread, magistrates in at least some jurisdictions developed the practice of warning arrestees of their right to remain silent as a means to ensure admission of the confessions that resulted from their interrogations. Id. at 789

("Beginning in the late-eighteenth and early-nineteenth centuries, magistrates began to caution suspects they examined that their statements could be used against them. Courts began to allow the statements to be admitted, notwithstanding otherwise improper inducement, if the suspect was cautioned he was not required to answer the magistrate's questions and made aware of the consequences of confessing.") (citation omitted). This practice, including a warning about the right to counsel, was codified in New York in 1829, and that statute was copied by Missouri and Arkansas shortly thereafter. See George C. Thomas III & Amy Jane Agnew, Happy Birthday <u>Miranda</u> and How Old Are You, Really? 43 N. Ky. L. Rev. 301, 301, 312-314 (2016); Oliver, 81 Tul. L. Rev. at 792; see also Albert W. Alschuler, A Peculiar Privilege in Historical Perspective: The Right to Remain Silent, 94 Mich. L. Rev. 2625, 2660-2661 (1996) ("In New York City, magistrates began routinely to caution defendants in 1835[.]"). There is evidence that some American police also may have begun warning suspects of their rights by the mid-1800s. Oliver, 81 Tul. L. Rev. at 798-808. But it

appears that at least one jurisdiction that claimed to have adopted the police practice of warning suspects of their rights abandoned any such practice by the end of the 19th century. See id. at 810-820 (discussing New York Police Department's abandonment of practice of giving warnings to suspects around 1875); Oliver, 62 Rutgers L. Rev. at 465 (same). Professor Wigmore in his treatise cited English case law for the proposition that "it is plain that the old practice was to give such a warning, when it appeared to be needed." 4 John Henry Wigmore, A Treatise on the System of Evidence in Trials at Common Law § 2269 (1905). "But," he added,

> as general knowledge spread among the masses, and the preparation for testimony became more thorough, this practice seems to have disappeared in England, so far at least as any general rule was concerned. In this country both the rule and the trial custom vary in the different jurisdictions.

Id. (footnote omitted).

More importantly, prior to Miranda, it does not appear that the failure to warn a suspect of his rights, without more, was widely considered a basis to exclude a statement. At least one leading 19th

century treatise made clear that failure to give such warnings was not itself a basis to exclude the statement:

> Neither is it necessary to the admissibility of any confession, to whomsoever it may have been made, that it should appear that the prisoner was *warned* that what he said would be used against him. On the contrary, if the confession was voluntary, it is sufficient, though it should appear that he was not so warned.

1 Simon Greenleaf, A Treatise on the Law of Evidence § 229 (11th ed. 1863) (emphasis in original); see also Leonard W. Levy, Origins of the Fifth Amendment: The Right Against Self-Incrimination 375 (1968) ("[A suspect] lacked the right to be warned that he need not answer, for the authorities were under no legal obligation to apprise him of that right. That reform did not come in England until Sir John Jervis's Act in 1848, and in the United States more than a century later the matter was still a subject of acute constitutional controversy."). Although at least one New York decision from the mid-1800s contained dicta suggesting that confessions made without proper caution of the right to remain silent are not admissible, that decision did not specify the source of such a rule. See O'Brien v. People, 48 Barb. 274, 280 (N.Y. Gen. Term 1867). The

United States Supreme Court held around the turn of the 20th century that the Fifth Amendment right against compelled self-incrimination does not require a confession to be preceded by warnings that the suspect's words could be used against him. See Powers v. United States, 223 U. S. 303, 313-314 (32 SCt 281, 56 LE 448) (1912) (no violation of Fifth Amendment right against compelled self-incrimination where defendant not warned that what he might say in testimony at preliminary hearing before federal commissioner might be used against him at trial); see also Wilson v. United States, 162 U. S. 613, 623 (16 SCt 895, 40 LE 1090) (1896) (rejecting claim that defendant's statement to investigating commissioner was involuntarily given, noting it is not essential to admissibility that confessor be warned that what he said could be used against him). And we are aware of no Georgia court decision prior to Miranda, let alone before or contemporaneous with the adoption of the 1877 Provision, that suggested that the failure to warn a suspect in custody of his right against compelled self-

incrimination rendered the suspect's statement or incriminating act inadmissible.

In sum, there is no significant evidence from the common law as it was understood in 1776, Georgia law as of 1877, or the larger American legal context as of 1877 that the right to be free from compelled self-incrimination was understood to require suspects in custody to be warned of that right — or any other constitutional right — in order for their otherwise voluntary statements to be admissible. Nor have we found any evidence that in the years following adoption of the 1877 Provision that it was understood to require a suspect in custody to be warned of any constitutional rights in order for a confession to be admissible. Cf. <u>Moore v. State</u>, 130 Ga. 322, 332 (2) (60 SE 544) (1908) (holding that it was not error for a trial court to refuse defense counsel's request to warn a witness of his right against compelled self-incrimination, because a witness "is presumed to know the law," including that he cannot be compelled to answer any question that would tend to incriminate him, and the right "is designed for the protection of the witness

himself," not another who may be interested in his testimony); <u>Dunn v. State</u>, 99 Ga. 211, 211 (2) (syllabus) (25 SE 448) (1896) ("The failure of the court to caution a witness that he need not answer a question if the answer would tend to criminate him, is not cause for setting aside a verdict against one upon whose trial for a crime this witness testified."); see also <u>Elliott</u>, 305 Ga. at 217 (IV) (C) (ii) (noting that decisions issued shortly after the adoption of the 1877 Provision "could not change its original public meaning" but are "good indicators of its meaning" given their temporal proximity). Indeed, Turnquest conceded at oral argument that no Georgia case prior to <u>Miranda</u> required warnings to be given. We conclude that the original public meaning of the 1877 Provision did not preclude the admissibility of an incriminating act or statement of a suspect in custody merely because the suspect was asked to perform the act or provide the statement without first being warned of any constitutional rights.

(ii) *We find no consistent and definitive construction or other significant legal developments prior to the 1983 Constitution that*

*changed the original public meaning of the 1877 Provision with respect to the necessity of warnings.*

Of course, it is Paragraph XVI of the 1983 Constitution that is ultimately at issue in this case, not the 1877 Provision. But because the 1877 Provision was retained in the 1983 Constitution without material change, we presume absent a consistent and definitive construction or other significant developments to the contrary that Paragraph XVI carries the same meaning as that of the 1877 Provision. See Elliott, 305 Ga. at 183-184 (II) (A)-(B). We find no reason to depart from that presumption here.

It is certainly true that, well before the Miranda decision in 1966 and the adoption of the current Paragraph XVI in 1983, suspects in Georgia were at least occasionally warned of their right against compelled self-incrimination before being questioned. See, e.g., Russell v. State, 196 Ga. 275, 277-278 (26 SE2d 528) (1943); Whitworth v. State, 155 Ga. 395, 399-400 (2) (117 SE 450) (1923); see also Davis v. State, 122 Ga. 564, 565 (2) (50 SE 376) (1905) (noting, in context of grand jury testimony, that the "better practice

is, not only to notify a witness that he will not be compelled to testify to anything that will criminate him, but also, when a particular question is asked, to warn him that the answer to such question might have that effect; and especially is this true where the witness belongs to an ignorant class"). And, prior to Miranda, we sometimes mentioned warnings or the lack thereof in determining whether a confession was admissible. See Russell, 196 Ga. at 282-286 (2) (noting warning that the defendant did not have to answer questions, while rejecting a challenge to the admission of the defendant's statement, given "no evidence of any force or even of persuasion brought to bear on the defendant"); Fairfield v. State, 155 Ga. 660, 668-669 (8) (118 SE 395) (1923) (no error in admitting defendant's statement at preliminary hearing for other suspects, despite lack of warning that he could decline to answer questions that tended to incriminate him, where defendant was not charged with offense for which he ultimately was tried at the time of the hearing); Whitworth, 155 Ga. at 399-402 (2) (finding confession admissible under state hope of benefit statute where sheriff told

defendant he did not have to make a statement and did not tell defendant he would benefit from confessing); Adams v. State, 129 Ga. 248 (58 SE 822) (1907) (noting defendants were not informed that they were not required to testify before coroner's jury in concluding that such prior testimony was inadmissible under hope of benefit statute and statute providing that defendants' statements in preliminary hearings should not be under oath).[5]

But the case law contains no indication — let alone a consistent and definitive construction — that such warnings were a constitutional prerequisite to admissibility of otherwise voluntary statements prior to the adoption of the 1983 Constitution.[6] To the

---

[5] Consideration of warnings or lack thereof as part of whether a defendant's statement was voluntary under the totality of the circumstances was consistent with pre-Miranda federal case law. See Davis v. North Carolina, 384 U. S. 737, 740-741 (86 SCt 1761, 16 LE2d 895) (1966), cited in Green v. State, 115 Ga. App. 685, 687 (1) (155 SE2d 655) (1967).

[6] In determining the original public meaning of a provision of the Georgia Constitution, we have considered legal developments both before the original adoption of a provision and in the period immediately following it. See Elliott, 305 Ga. at 212 (IV) (C). We discuss in further detail below the relevance of Price to this case but note here that we do not afford it similar consideration as relevant to the original public meaning of Paragraph XVI, even though it and the Court of Appeals cases on which it was based were decided less than two decades after the 1983 Constitution. Because of the textual similarity of

contrary, the Georgia Court of Appeals stated quite plainly in 1948 that "[t]here is no requirement of law that a defendant be apprised of his constitutional rights or that his statements may be used against him." McDowell v. State, 78 Ga. App. 116, 120 (1) (50 SE2d 633) (1948). And although rejections of arguments based on Miranda are of course not holdings as to the Georgia Constitution, the failure of any court to mention a separate Georgia right to a warning in rejecting a Miranda claim in the years following that decision undermines any suggestion that the Georgia Constitution was widely understood at that time to require a similar warning. See Purvis v. State, 129 Ga. App. 208, 208-209 (1) (199 SE2d 366) (1973) (rejecting argument that results of intoximeter test should have

---

Paragraph XVI to the 1877 Provision (and the equivalent provisions of our intervening Constitutions), we presume Paragraph XVI to have carried forward without change the original public meaning of the 1877 Provision. And neither Price nor the cases on which it relied identified any pre-1983 basis other than Miranda for a new meaning of Paragraph XVI (for that matter, Price did not suggest that anything about the Georgia Constitution had changed at all). And Miranda itself cannot have changed the meaning of the much older Georgia right against compelled self-incrimination; indeed, to allow decisions of the United States Supreme Court interpreting the federal Constitution to change the meaning of the Georgia Constitution is to abandon any pretense of having an independent state Constitution at all.

been excluded because defendant was not advised of constitutional privilege against self-incrimination and his right to refuse; citing Schmerber for the proposition that the federal "constitutional privilege against self-incrimination does not apply to non-communicative acts such as an intoximeter test"); Bass v. State, 115 Ga. App. 461, 462 (1) (154 SE2d 770) (1967) (recognizing that states may apply Miranda retroactively but stating that "[t]he majority of the judges of this court, however, are not inclined to proclaim stricter standards than the Miranda Case requires"). Given the lack of a consistent and definitive construction or any other intervening development[7] that altered the original public meaning of the 1877 Provision as to the necessity of warnings, we conclude that Paragraph XVI retained the 1877 Provision's original public meaning on this point. Paragraph XVI does not require that a suspect in custody be warned of any constitutional rights before being asked to submit to a breath test.

---

[7] We note that no party has pointed to any other such development.

(b) *Paragraph I of the Georgia Constitution does not require suspects in custody to be warned of any constitutional rights before being asked to submit to a breath test.*

Given <u>Miranda</u>'s due process elements, we also consider, and reject, the possibility that Paragraph I requires suspects in custody to be warned of any constitutional rights before being asked to perform incriminating acts like submitting to a breath test. Paragraph I provides that "[n]o person shall be deprived of life, liberty, or property except by due process of law." Ga. Const. of 1983, Art. I, Sec. I, Par. I. Nothing in the plain language of that provision conditions admissibility of an incriminating statement or act by a suspect in custody on the suspect first being warned of his constitutional rights. And although we acknowledge that what process is "due" almost always has been determined from extratextual sources, nothing in the history or context of Georgia's adoption of that provision requires such an understanding, either. An express due process provision first entered the Georgia Constitution in 1861; the 1861 Constitution provided, "No citizen shall be deprived of life, liberty or property, except by due process of

law; and of life or liberty, only by the judgment of his peers." Ga. Const. of 1861, Art. I, Par. IV. The 1865 Constitution replaced the word "citizen" with "person" and dropped the second clause. See Ga. Const. of 1865, Art. I, Par. II ("No person shall be deprived of life, liberty, or property, except by due process of law."). A substantially identical version of this provision has been readopted in every Georgia Constitution since. Ga. Const. of 1868, Art. I, Sec. III ("No person shall be deprived of life, liberty, or property, except by due process of law."); Ga. Const. of 1877, Art. I, Sec. I, Par. III (same); Ga. Const. of 1945, Art. I, Sec. I, Par. III (same); Ga. Const. of 1976, Art. I, Sec. I, Par. I (same); Ga. Const. of 1983, Art I, Sec. I, Par. I (same except without the final comma). As made clear from the discussion above, there is no significant evidence from either English common law as it was understood in 1776 or Georgia law or the broader American legal context of the 1860s that any right, let alone the due process right, was understood to require suspects in custody to receive any sort of warnings in order for their otherwise voluntary statements to be admissible. And although the *federal*

context may have changed in 1966 by virtue of <u>Miranda</u>, nothing in the legal history leading up to the adoption of our current Paragraph I in 1983 indicates that our *state* constitutional due process right was understood by Georgians and Georgia courts to have changed in the same way. And so, if we interpret the Georgia right to due process independently of the federal right, no prophylactic warning would be required.

We recognize that "this Court has held in a number of other contexts that the process due under the United States Constitution and the Georgia Constitution is the same." <u>Miller v. Deal</u>, 295 Ga. 504, 510 (2) n.11 (761 SE2d 274) (2014).[8] In some such cases, we have alluded to the possibility that the Georgia and federal due process rights may be different, but declined to consider such a distinction because the parties failed to make any such argument.

---

[8] We have explained that proper state constitutional interpretation requires careful analysis of the language, history, and context of the provision at issue. See <u>Olevik</u>, 302 Ga. at 234 (2) (b) n.3 (citing <u>Grady v. Unified Govt. of Athens-Clarke County</u>, 289 Ga. 726, 729-731 (2) (b) (715 SE2d 148) (2011)). We note no such analysis was done in any of the cases conflating the United States and Georgia constitutional guarantees of due process.

See, e.g., <u>Carr v. State</u>, 303 Ga. 853, 857-858 (2) n.8 (815 SE2d 903) (2018); <u>Gregory v. Sexual Offender Registration Review Bd.</u>, 298 Ga. 675, 675 n.1 (784 SE2d 392) (2016). And in some older cases, we held that Georgia due process is not controlled by federal due process decisions. See, e.g., <u>Pope v. City of Atlanta</u>, 240 Ga. 177, 178 (1) (240 SE2d 241) (1977); <u>Harris v. Duncan</u>, 208 Ga. 561, 563 (67 SE2d 692) (1951); <u>Nat. Mtg. Corp. v. Suttles</u>, 194 Ga. 768, 771-772 (22 SE2d 386) (1942). Indeed, it is difficult to conceive how or why Georgians would delegate to the United States Supreme Court the authority to alter the meaning of the Georgia Constitution by unknown future federal decisions. See <u>Olevik</u>, 302 Ga. at 234-235 (2) (b) n.3.

But, of course, there is no decision of the United States Supreme Court holding that the federal Due Process Clause (or any other federal constitutional provision) requires <u>Miranda</u> warnings to precede a request for a breath test. So even if we were to interpret the Georgia due process right identically with federal interpretations of the federal due process right, Turnquest cannot prevail. And as we have already explained, a more careful analysis

rooted not in federal case law but in Georgia text, history, and context shows no basis for any prophylactic warning requirement. Paragraph I does not require <u>Miranda</u>-style prophylactic warnings before law enforcement may ask persons in custody to submit to a breath test.

(c) *OCGA § 24-5-506 (a) does not require that a suspect in custody be warned of any constitutional rights before being asked to submit to a breath test.*

Although the trial court cited the precursor to OCGA § 24-5-506 (a) as at least one possible basis for requiring a warning to precede a request for consent to a breath test, that statute does not mandate the warning that Turnquest claims was required, either. OCGA § 24-5-506 (a) provides: "No person who is charged in any criminal proceeding with the commission of any criminal offense shall be compellable to give evidence for or against himself or herself." Nothing in the text of the statute requires a warning. This statute's language, with minor variation, predates the 1877 Provision. See 1868 Code § 3798 (2); 1873 Code § 3854 (2); 1882 Code § 3854 (2); 1895 Penal Code § 1011 (2); 1910 Penal Code § 1037 (2);

1933 Code § 38-416; OCGA § 24-9-20 (a) (1973);[9] OCGA § 24-5-506 (a). Despite this long history, we have found no instance prior to State v. O'Donnell, 225 Ga. App. 502, 504-505 (2) (484 SE2d 313) (1997), in which our appellate courts held that this statute mandated any sort of warning. And to the extent we have equated the statute with Paragraph XVI, see, e.g., Keenan v. State, 263 Ga. 569, 572 (2) (436 SE2d 475) (1993), we have already concluded above that Paragraph XVI does not require warning suspects in custody of their right against compelled self-incrimination. Accordingly, we conclude that this statute does not require any sort of warning before a suspect in custody is asked to submit to a breath test.[10]

Thus, regardless of whether Turnquest is arguing that he is entitled to the same warning set forth in Miranda, or some

---

[9] Former OCGA § 24-9-20 (a) provided: "No person who is charged in any criminal proceeding with the commission of any indictable offense or any offense punishable on summary conviction shall be compellable to give evidence for or against himself."

[10] We also note that we have said that the statute "applies only to those who have been charged with an offense — i.e., accused in a returned or proposed charging document — at the time they are called to testify." State v. Lampl, 296 Ga. 892, 899 (2) (770 SE2d 629) (2015).

alternative warning of the right against compelled self-incrimination specific to Georgia law, we conclude that neither the Georgia Constitution nor OCGA § 24-5-506 requires that a suspect in custody receive any such warning before being asked to perform a breath test. But that does not end our analysis. We must also consider whether principles of stare decisis warrant retaining the holding of Price, 269 Ga. at 225.

4. *Principles of stare decisis do not warrant retaining the holding of Price.*

As noted at the outset of this opinion, we held in Price that the failure to give a suspect in custody "Miranda warnings" rendered evidence regarding field sobriety tests inadmissible. 269 Ga. at 225 (3). Notwithstanding the reference to Miranda, Price was clearly a decision of state law.[11] The basis for our ruling that Miranda warnings were required under state law was not entirely clear,

---

[11] We recognized the inapplicability of Miranda itself in Price, indicating that the appellant's challenges were based "on state law grounds[,]" and noting that "[a] defendant who raises only a federal law challenge will not succeed because under the U.S. Constitution the prohibition against self-incrimination applies only when the evidence is 'testimonial' and field sobriety tests are not 'testimonial' in nature." 269 Ga. at 224-225 (3) & n.13.

however. Our opinion did not cite, let alone analyze, any particular Georgia statute or Georgia constitutional provision in support of its holding. Rather, we stated that "[d]ecisions of this Court and the court of appeals have routinely held that under Georgia law <u>Miranda</u> warnings must precede a request to perform a field sobriety test only when the suspect is 'in custody.'" <u>Price</u>, 269 Ga. at 225 (3) (citation omitted).

In support of that conclusion, we cited a decision of this Court in which we said that admission of the appellant's refusal to undergo an alco-sensor test[12] notwithstanding a lack of <u>Miranda</u> warnings did not violate the appellant's rights under the federal and state constitutional provisions against compelled self-incrimination, or former OCGA § 24-9-20. See <u>Keenan</u>, 263 Ga. at 571-572 (2). In <u>Keenan</u> we stated in conclusion that the admission of the appellant's refusal did *not* violate any of these provisions because the appellant

---

[12] An alco-sensor test, different from the test at issue in this case, is an initial screening device used to aid an officer in determining probable cause to arrest a motorist suspected of DUI. See <u>Keenan</u>, 263 Ga. at 571 (2).

was *not* in custody at the time the test was requested. Id. at 572 (2). But we also stated that OCGA § 24-9-20 was "inapplicable to the field sobriety tests in the case at bar because appellant was not a person charged in a criminal proceeding at the time he was requested to complete the tests." Id. (citation and punctuation omitted). We equated the statute with Paragraph XVI without further analysis of the constitutional provision (which does not appear to have been raised by the appellant in that case) and noted that the Fifth Amendment "covers only a defendant's statements[.]" Id. (citation and punctuation omitted) In <u>Price</u>, however, we relied on <u>Keenan</u> in support of our conclusion that "Georgia law" required that <u>Miranda</u> warnings *must* precede a request for a field sobriety test when a suspect *is* in custody. <u>Price</u>, 269 Ga. at 225 (3) n.13. But <u>Keenan</u> offered no support for such a conclusion. For one, although the decision discussed whether <u>Miranda</u> warnings were required under the Fifth Amendment, <u>Keenan</u> was about evidence of *refusal* to perform an incriminating act, such that it is not clear that the claims under state law were even about the failure to give warnings.

In addition, given that <u>Keenan</u> merely provided reasons for *rejecting* a claim where a defendant is not in custody, it is of little utility in determining whether warnings might be required where a defendant is in custody.

In support of our decision in <u>Price</u>, we also cited the Court of Appeals's decision in <u>O'Donnell</u>, which apparently held that former OCGA § 24-9-20 (*not* the Georgia Constitution) required a suspect in custody to be warned of his right against compelled self-incrimination before being asked to take field sobriety tests — notwithstanding a lack of textual or historical support for such a reading of the statute. 225 Ga. App. at 504-505 (2). Other decisions we cited in <u>Price</u> considered whether a particular defendant was in custody for purposes of <u>Miranda</u> when field sobriety tests were administered, without citing any Georgia statute or constitutional provision. See <u>State v. Pastorini</u>, 222 Ga. App. 316, 317-318 (1) (474 SE2d 122) (1996); <u>State v. Whitfield</u>, 214 Ga. App. 574, 574-575 (3) (448 SE2d 492) (1994).

Whatever the specific basis for <u>Price</u>'s holding, it is at odds with our conclusion that neither Georgia statutory nor constitutional law requires a <u>Miranda</u> warning or something like it in this context. Although <u>Price</u>'s holding about field sobriety tests — which encompass a variety of tests with different characteristics, but not a breath test of the sort at issue here and in <u>Olevik</u> and <u>Elliott</u> — does not directly control the issue of whether the giving of <u>Miranda</u> warnings or something similar is a condition of admissibility of the results of a breath test performed by a suspect in custody, there is no principled basis for distinguishing <u>Price</u>'s holding from the issue before us today. Thus, this case requires us to consider whether <u>Price</u> was rightly decided and, if not, whether we should nonetheless retain the rule as a matter of stare decisis.

> Under the doctrine of stare decisis, courts generally stand by their prior decisions, because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Stare decisis, however, is not an inexorable command. Courts, like individuals, but with more caution and deliberation, must sometimes reconsider what has been already carefully considered,

and rectify their own mistakes. In reconsidering our prior decisions, we must balance the importance of having the question *decided* against the importance of having it *decided right*. To that end, we have developed a test that considers the age of precedent, the reliance interests at stake, the workability of the decision, and, most importantly, the soundness of its reasoning. The soundness of a precedent's reasoning is the most important factor.

Olevik, 302 Ga. at 244-245 (2) (c) (iv) (citations and punctuation omitted; emphases in original).

For the reasons discussed above, the reasoning of Price was unsound, which is the most important stare decisis consideration, especially in constitutional cases. Although Price appears to be a decision of Georgia statutory law, Georgia constitutional law, or both, it contains no discussion of any particular Georgia statute or constitutional provision. Neither our opinion in Price nor any of the authorities on which it relies contain any analysis of whether the language, history, and context of the Georgia Constitution required Miranda warnings as a matter of Georgia constitutional law; when such analysis is actually done, it is plain that the Georgia Constitution requires no such thing in this context. And to the

extent that <u>Price</u> was based on former OCGA § 24-9-20, its holding has no basis in history or the text of that provision.

None of the remaining stare decisis factors indicate that we should retain this unfounded decision. On the age factor, we decided <u>Price</u> 21 years ago, and we have overruled decisions older than that. See <u>Southall v. State</u>, 300 Ga. 462, 468 (1) (796 SE2d 261) (2017) (overruling a 45-year-old precedent on premature motions for new trial); <u>Woodard v. State</u>, 296 Ga. 803, 808-814 (3) (771 SE2d 362) (2015) (overruling 24-year-old interpretation of justification statute); <u>State v. Hudson</u>, 293 Ga. 656, 661-662 (748 SE2d 910) (2013) (overruling 38-year-old precedent regarding when a new post-appeal sentence is unconstitutionally vindictive); <u>State v. Jackson</u>, 287 Ga. 646, 659-660 (5), (6) (697 SE2d 757) (2010) (overruling nearly 29-year-old interpretation of felony murder statute); see also <u>Olevik</u>, 302 Ga. at 244-246 (2) (c) (iv) (overruling 17-year-old construction of Paragraph XVI); <u>Ga. Dept. of Natural Resources v. Center for a Sustainable Coast, Inc.</u>, 294 Ga. 593, 601-602 (2) (755 SE2d 184) (2014) (reversing 19-year-old decision on sovereign

immunity). <u>Price</u> also created no reliance interests of the sort normally considered in stare decisis analysis. See <u>Olevik</u>, 302 Ga. at 245-246 (2) (c) (iv). And the workability factor cuts neither in favor of nor against retaining the rule of <u>Price</u>. As <u>Price</u> by its terms requires <u>Miranda</u> warnings, which inform suspects of their "right to remain silent," see 384 U. S. at 444, and not some Paragraph XVI-specific warning also apprising suspects of their right to refuse to perform an incriminating *act*, retaining <u>Price</u> would not actually serve the purpose of meaningfully informing DUI suspects of their state constitutional right to refuse a breath test. On the other hand, a rule under which law enforcement need not provide <u>Miranda</u> warnings to suspects in custody who are asked to perform a breath test means that police must take care not to engage in any interrogation within the meaning of <u>Miranda</u> before a warning is given.[13]

---

[13] None of this is to say that requiring warnings as <u>Miranda</u> does and <u>Price</u> did is a poor policy choice. It may be good policy. See <u>Dickerson</u>, 530 U. S. at 444 (experience suggests that the totality-of-the-circumstances test of voluntariness under the federal Due Process Clause "is more difficult than *Miranda* for law enforcement officers to conform to, and for courts to apply in

Accordingly, we overrule <u>Price</u> and other Georgia appellate decisions to the extent that they hold that either OCGA § 24-5-506 (a) or the Georgia Constitution requires law enforcement to warn suspects in custody of their right to refuse to perform an incriminating act.[14] We also disapprove language in other decisions that is inconsistent with our holding in this case.[15] Because the trial

_____

a consistent manner"). It may be bad policy. See Roseanna Sommers & Vanessa K. Bohns, The Voluntariness of Voluntary Consent: Consent Searches and the Psychology of Compliance, 128 Yale L.J. 1962, 2014-2019 (2019) (summarizing research suggesting <u>Miranda</u> has made little difference to whether people consent to speak to law enforcement). But that policy choice is not for this Court to make.

[14] See, e.g., <u>State v. Norris</u>, 281 Ga. App. 193, 197 (635 SE2d 810) (2006); <u>O'Donnell</u>, 225 Ga. App. at 504-505 (2); <u>Whitfield</u>, 214 Ga. App. at 574-575 (3).

[15] In this Court's only decision to have employed the language of <u>Price</u>, we concluded that the trial court did not err in denying the appellant's motion to suppress the results of his field sobriety tests, because he was not in custody at the time he was asked to undergo them. See <u>Mitchell v. State</u>, 301 Ga. 563, 568-569 (2) (802 SE2d 217) (2017). Most of the remaining Court of Appeals cases that recite the rule of <u>Price</u> (or were cited therein) are similar; in none of these does the rule affect the outcome. See, e.g., <u>Pedersen v. State</u>, 337 Ga. App. 159, 162 (786 SE2d 535) (2016); <u>State v. Mosley</u>, 321 Ga. App. 236, 238 (739 SE2d 106) (2013); <u>Crider v. State</u>, 319 Ga. App. 567, 568-569 (737 SE2d 344) (2013); <u>Rowell v. State</u>, 312 Ga. App. 559, 565 (2) (b) (718 SE2d 890) (2011); <u>Hale v. State</u>, 310 Ga. App. 363, 365-366 (1) (714 SE2d 19) (2011); <u>Monahan v. State</u>, 292 Ga. App. 655, 658 (1) n.2 (665 SE2d 387) (2008); <u>Grodhaus v. State</u>, 287 Ga. App. 628, 630 (1) (653 SE2d 67) (2007); <u>McDevitt v. State</u>, 286 Ga. App. 120, 121-122 (1) (648 SE2d 481) (2007); <u>Doyle v. State</u>, 281 Ga. App. 592, 593-594 (1) (636 SE2d 751) (2006); <u>State v. Dixon</u>, 267 Ga. App. 320, 321 (599 SE2d 284) (2004); <u>State v. Pierce</u>, 266 Ga. App. 233, 235 (1)

court's ruling suppressing the results of Turnquest's breath test relied on <u>Price</u>, we vacate that ruling.

5. *We remand for the trial court to consider Turnquest's alternative argument in the light of <u>Elliott</u>.*

We vacate rather than reverse the trial court's ruling, because the trial court's resolution of the motion to suppress based on <u>Price</u> meant that it did not consider alternative arguments for suppression raised by Turnquest. In particular, the trial court did not rule on Turnquest's argument that his breath test results should be suppressed because the implied consent advisement provided to him

---

(596 SE2d 725) (2004); <u>State v. Foster</u>, 255 Ga. App. 704, 705 (566 SE2d 418) (2002); <u>Harmon v. State</u>, 253 Ga. App. 140, 141 (1) (558 SE2d 733) (2001); <u>State v. Lentsch</u>, 252 Ga. App. 655, 658 (2) (556 SE2d 248) (2001), overruled on other grounds by <u>Hough v. State</u>, 279 Ga. 711, 716-717 (2) (a) (620 SE2d 380) (2005); <u>Arce v. State</u>, 245 Ga. App. 466, 466 (538 SE2d 128) (2000); <u>State v. Coe</u>, 243 Ga. App. 232, 234 (2) (533 SE2d 104) (2000), overruled on other grounds by <u>Olevik</u>, 302 Ga. at 246 (2) (c) (iv) n.11; <u>Scanlon v. State</u>, 237 Ga. App. 362, 364 (4) (514 SE2d 876) (1999), overruled on other grounds by <u>Olevik</u>, 302 Ga. at 246 (2) (c) (iv); <u>Smith v. State</u>, 236 Ga. App. 548, 551 (2) (512 SE2d 19) (1999), reversed on other grounds, 272 Ga. 83 (526 SE2d 59) (2000); <u>Kehinde v. State</u>, 236 Ga. App. 400, 401 (512 SE2d 311) (1999); <u>Evans v. State</u>, 234 Ga. App. 337, 338 (1) (506 SE2d 681) (1998); <u>Nameth v. State</u>, 234 Ga. App. 20, 21 (2) (505 SE2d 778) (1998); <u>Buchnowski v. State</u>, 233 Ga. App. 766, 768 (2) (505 SE2d 263) (1998); <u>State v. Kirbabas</u>, 232 Ga. App. 474, 476 (502 SE2d 314) (1998); <u>Sisson v. State</u>, 232 Ga. App. 61, 67 (4) (499 SE2d 422) (1998); <u>Pastorini</u>, 222 Ga. App. at 317-318 (1).

was misleading in that it suggested that if he refused the test, that refusal could be used against him at trial and could affect his driving privileges. This argument implicates our decision in <u>Elliott</u>, which had not been decided at the time the trial court ruled on the motion to suppress. We therefore remand for the trial court to consider Turnquest's alternative argument for suppression in the light of <u>Elliott</u>.

<u>Judgment vacated and case remanded. All the Justices concur</u>.

Decided May 6, 2019.

Breath test; warnings. Gwinnett Superior Court. Before Judge Iannazzone, pro hac vice.

Daniel J. Porter, District Attorney, Samuel R. d'Entremont, Assistant District Attorney; Brian W. Whiteside, Solicitor-General, Christopher M. DeNeve, Assistant Solicitor-General; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Fakiha Khan, Kendra F. Mitchell, for appellee.