## A05A1635. CORBETT v. THE STATE.
(627 SE2d 365)

ANDREWS, Presiding Judge.

James Carroll Corbett, convicted by a jury of vehicular homicide by driving under the influence of alcohol to the extent that it was less safe for him to drive (OCGA § 40-6-391 (a) (1)),[1] appeals following denial of his motion for new trial, contending that the evidence was legally insufficient and that he received inadequate assistance of counsel.

1. Corbett, in his second and third enumerations of error, argues that the trial court erred in denying his motion for directed verdict on Counts 2 and 4 and that the evidence was legally insufficient to support the jury's verdict on all counts.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict. *Paul v. State*, 231 Ga. App. 528 (499 SE2d 914) (1998). We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The standard for reviewing both a challenge to the sufficiency of the evidence and the denial of a motion for a directed verdict is that the verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.; *Williams v. State*, 233 Ga. App. 217 (1) (504 SE2d 53) (1998).

So viewed, the evidence was that, on September 28, 2002, Tifton Police Officer Story and Lieutenant Tyson responded to a one-vehicle wreck on Third Street around 9:15 p.m. and found a 1996 Ford F-150 pickup truck had hit two utility poles which were laying over the truck. Nearby, the officers found the body of Jesus Urbina Hernandez on the ground with a Spanish New Testament nearby. Corbett was outside the truck and, when he was approached, both officers smelled alcohol and noticed his eyes were glassy and bloodshot. Corbett was unsteady on his feet and appeared to the officers to be under the influence of alcohol. When Lieutenant Tyson examined the truck, he saw a liquid all over the floorboard of the truck which he determined to be beer. He also saw darker spots of the liquid on the seat and dash. Just outside the passenger door, Tyson found an open can of Natural Light beer and a bottle of Lord Calvert whiskey. Tyson also noted a large fractured area in the windshield directly in front of the driver's seat, indicating contact straight into the windshield. Corbett was

---

[1] Corbett was also charged with and convicted by the jury of vehicular homicide by DUI with a blood alcohol level of more than 0.08 grams; DUI (less safe); and DUI (more than 0.08 grams). These three counts were merged by the court with Count 1 at sentencing.

placed under arrest for DUI and read the implied consent notice. He consented to the test and was tested on the Intoxilyzer 5000 approximately 40 minutes to an hour after the wreck. He registered 0.104 blood alcohol concentration.

Dr. Clark, the medical examiner, performed the autopsy of Hernandez and found a broken neck, a lacerated spinal cord, and fractured vertebrae. In his opinion, these injuries indicated a "tremendous impact to the back right side of his head . . . causing the fracturing of the neck." The autopsy also revealed a large bruise to the back of Hernandez's head where his head impacted some solid surface; injuries to the abdomen, colon, spleen and kidney; fractured right pelvic bone; and brain hemorrhaging. From his examination, Dr. Clark opined that Hernandez was struck from behind by a vehicle coming directly toward him. Based on bruising, Dr. Clark concluded that the height of the initial impact to Hernandez was 21 to 22 inches above his heel. Hernandez tested negative for the presence of alcohol or drugs.

Lieutenant Tyson, a certified accident reconstructionist, found no skid marks prior to Corbett's impact with the telephone poles that would indicate evasive action. His measurements taken at the scene were consistent with Hernandez having been in the middle of the street when he was hit. He also described the location of the accident as very dark.

Evidence of a similar transaction was also introduced. On May 31, 2003, Anthony Gray was sitting in a mall parking lot when he observed an extended cab Ford truck, driven by Corbett, driving over curbs, through the grass, and over the curb by the road. This conduct continued for approximately 30 minutes and Gray decided to leave because the truck was riding real close to vehicles, including Gray's truck. Gray backed out and, before he could get his truck in drive, Corbett's truck had turned around and run into the rear of Gray's truck. Officer Hogan responded and found Corbett unsteady on his feet, with red bloodshot eyes, and smelling of alcohol. When tested on the Intoxilyzer 5000, Corbett's blood alcohol concentration registered 0.166.

Corbett testified and acknowledged that, on September 28, 2002, he had been moving his family to another apartment and he "drank a few beers that afternoon in the course of the move." Around 8:00 p.m., he went to get food and, on the way, he went into Berrien County to pick up a bottle of Lord Calvert. As he was driving down Third Street and coming into a curve, Corbett saw a man standing in the middle of his lane. He did not brake, but started to swerve about the time he struck Hernandez. Having been a paramedic for 20 years, Corbett had been through training and taught not to lock up the brakes, but to do graduated braking. Corbett acknowledged that,

according to the law, "I was not supposed to be on the road; but somewhere in there has to be considered the fact that Jesus was standing . . . in the middle of the road." He believed that he "had full faculties to be able to avoid that if he wouldn't have [been standing in the middle of the road]."

Although contending that he was not physically impaired when he struck Hernandez, Corbett also acknowledged that he "was obviously under the influence of the alcohol." He further acknowledged that he had drunk four or five beers that afternoon and that he had an open can of beer in the truck which he was drinking while he drove.

(a) Corbett contends that the trial court erred in denying his motion for directed verdict on Counts 2 (vehicular homicide by DUI with more than 0.08 grams of blood alcohol concentration) and 4 (DUI with more than 0.08 grams of blood alcohol concentration) because there was insufficient proof of the blood alcohol concentration.

Officer Story was asked what the results of the Intoxilyzer testing were and he responded ".104." Officer Hogan testified regarding the 2003 similar act that the results of the test "were .166." Corbett's argument is that these statements are insufficient to prove that his blood alcohol concentration was 0.08 grams or more. This argument, however, is premised on these two statements being the only evidence considered regarding this issue. The record and transcript also show that Corbett stipulated that the Intoxilyzers used for the charged incident and the similar act were "used to measure the blood alcohol content" of his body. Further the two officers testified that to use the Intoxilyzer, one blows into the mouthpiece and two breath samples are taken that register "blood alcohol content" based on the breath sample. Both officers also read into evidence their implied consent cards which include the language ".08 grams." Also, the trial court fully charged the jury on the statutory definitions of alcohol concentration and the requirements for conviction.

Considering the totality of the evidence, we find that any rational trier of fact could find Corbett guilty of these two counts. *Goddard v. State*, 242 Ga. App. 154, 155 (2) (529 SE2d 184) (2000); *Banks v. State*, 235 Ga. App. 701, 703 (2) (509 SE2d 63) (1998); *Burks v. State*, 195 Ga. App. 516, 518 (5) (394 SE2d 136) (1990).

(b) Corbett also argues that the evidence was legally insufficient to support his conviction of vehicular homicide, less safe, because there was no evidence that he was driving recklessly or driving badly.

The vehicular homicide statute requires the State to establish a causal connection between the defendant's violation of the DUI statute and the victim's death. It is not required that the defendant actually commit an unsafe act. *Miller v. State*, 236 Ga. App. 825, 828 (1) (513 SE2d 27) (1999); *Shelton v. State*, 214 Ga. App. 166, 168 (2) (447 SE2d 115) (1994).

Here, Corbett's defense was accident pursuant to OCGA § 16-2-2 based on Hernandez's standing in the middle of the road, the dark conditions, and his inability to avoid Hernandez. The jury was charged on and considered this defense. See *King v. State*, 262 Ga. App. 37, 40 (4) (584 SE2d 652) (2003).

The issue of proximate cause is at issue when considering the conduct of Hernandez and the resulting accident.

> If the injury did not flow naturally and directly from the defendant's wrongful act, or could not reasonably have been expected to result from his wrongful act, or would not have resulted but for the interposition of an independent and unforeseen cause, then the defendant's wrongful act would not be the proximate cause of the injury. But as long as the defendant's negligence proximately caused the injury of another, the crime has been committed, even if there are other factors which also are proximate causes of the injury. *Unlike the civil context, in the criminal context it simply is not relevant that the victim was negligent unless the defendant's conduct did not substantially contribute to the cause of the injury.*

(Footnotes omitted; emphasis supplied.) *Baysinger v. State*, 257 Ga. App. 273-274 (1) (570 SE2d 593) (2002).

We find the circumstances of this case very similar to those in *Miller v. State*, supra. There, Miller had been at a bar with friends and consumed an undetermined amount of beer. He drove the friends to one of their homes, weaving in his lane. He dropped the two friends off and started home after 2:00 a.m. On the way, he came upon and hit Stachur, riding his bicycle in the middle of the road in the same direction as Miller. It was dark and there were no streetlights or moonlight. Stachur was dressed in dark reflective clothing, wearing Walkman headphones, and although the bike had a rear reflector on it, it had no headlight or battery operated light. Although Miller said he tried to swerve to miss Stachur, there were no skid marks to evidence braking or other evasive action. The windshield of Miller's truck was shattered on the passenger's side and fabric was embedded in it. The right front of the truck suffered extensive damage. Stachur suffered a blunt force trauma to his head, which caused his death.

Miller's defense, as was Corbett's, was misfortune or accident under OCGA § 16-2-2. As found in that case and applicable here,

> [e]vidence supported a finding that the victim's death re-sulted from an unavoidable accident. But evidence also supported a fault-based finding. The jur[ies] could have

found that Miller [and Corbett were] operating . . . vehicle[s] while under the influence of alcohol to the extent it was less safe for [them] to drive. If this were so, obviously [their] reaction time would have been slower than it otherwise would have been.[2] The evidence also authorized findings that Miller [and Corbett] failed to take evasive action to avoid hitting [the victims]. . . . It was for the jur[ies] to determine whether, in the absence of the above factors, the decedent[s'] death[s] could have been avoided. Construed in a light most favorable to the verdict, the evidence was sufficient to authorize a rational trier of fact to find defendant guilty of first degree vehicular homicide beyond a reasonable doubt.

(Footnotes omitted.) *Miller v. State*, supra at 829 (3).

2. Finally, we consider Corbett's claim that his trial counsel was ineffective on the basis that he did not attempt to have a defense reconstruction specialist testify.

To be successful on a claim of ineffective assistance,

a defendant must show that counsel rendered deficient performance and that actual prejudice resulted. Counsel are strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, and counsel's performance is evaluated without reference to hindsight. A petitioner has suffered actual prejudice only where there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Ineffective assistance claims are mixed questions of law and fact. We accept the [trial] court's findings of fact unless clearly erroneous and independently apply the law to those facts.

(Citations and punctuation omitted.) *Head v. Hill*, 277 Ga. 255, 266 (VI) (587 SE2d 613) (2003).

Trial counsel testified at the motion for new trial hearing and explained that he considered whether another expert was needed. He believed, however, that Lieutenant Tyson provided the information

---

[2] " ' "No fact is better known or publicized than (the fact) that alcohol slows the reflexes, dulls the thinking processes, slows the impulse stimuli and reaction thereto. . . ." (Cits.)' *Menendez v. Jewett*, 196 Ga. App. 565, 569 (396 SE2d 294) (1990)." *Shelton v. State*, supra at 168 (2).

which he needed to support the sole defense of misfortune or accident, i.e., that Hernandez was standing in the middle of the road and it was very dark. He further stated that the decision not to seek funds for and hire such an expert was one of trial tactics because the State's expert was providing the needed facts.

Decisions regarding which witnesses to present are matters of trial strategy which do not constitute ineffective assistance of counsel when premised on legitimate evidentiary concerns, as explained by Corbett's trial counsel here. *Lenderman v. State*, 271 Ga. App. 883, 885 (611 SE2d 135) (2005).

Even were we to find it necessary to proceed to the second step in analyzing ineffective assistance, i.e., reasonable probability that, but for failure to hire an expert, the outcome of the trial would have been different, Corbett's claim fails.

> To establish the prejudicial effect of trial counsel's failure to present certain evidence, an appellant "is required to make an affirmative showing that specifically demonstrates how counsel's failure would have affected the outcome of the case." (Citation and punctuation omitted.) *Ware v. State*, 273 Ga. 16, 17 (3) (537 SE2d 657) (2000). "Absent a proffer of what the testimony of his expert would have been at trial, [Corbett] cannot show that there is a reasonable probability that the outcome of the trial would have been different had his counsel taken the suggested course." *Madge v. State*, 245 Ga. App. 848, 851 (3) (a) (538 SE2d 907) (2000).

*Cupe v. State*, 253 Ga. App. 851, 856-857 (3) (e) (560 SE2d 700) (2002).

As noted by the trial court at the conclusion of the hearing on the motion for new trial, no such showing was made here.

*Judgment affirmed. Phipps and Mikell, JJ., concur.*

DECIDED JANUARY 31, 2006 —
RECONSIDERATION DENIED FEBRUARY 23, 2006 —

*James M. Walker III*, for appellant.
*C. Paul Bowden, District Attorney, Kevin E. Hutto, Bradford L. Rigby, Assistant District Attorneys*, for appellee.