**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed. https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 15, 2020**

# In the Court of Appeals of Georgia

A20A0512. SMITH v. THE STATE.                                    DO-019 C

DOYLE, Presiding Judge.

Following a jury trial, Quincy A. Smith was convicted of first degree vehicular homicide[1] predicated on driving under the influence ("DUI") per se.[2] He appeals his conviction, contending that the trial court erred by: (1) admitting evidence of a prior arrest for DUI under OCGA § 24-4-404 (b); (2) denying his motion to suppress evidence from his roadside encounter with police; (3) allowing the State to impeach him with statements he made during a prior bond hearing; and (4) denying his request

---

[1] OCGA § 40-6-393 (a).

[2] OCGA § 40-60-391 (a) (5). Smith also was found guilty of a second count of vehicular homicide based on DUI less safe (OCGA § 40-6-391 (a) (1)) as well as a corresponding DUI-less-safe count. All of the counts merged into the vehicular homicide based on the DUI-per-se count.

for a jury instruction on proximate cause. For the reasons that follow, we affirm.

Construed in favor of the verdict,[3] the evidence shows that in March 2015, Smith's wife woke him up to drive her to church at approximately 7:00 a.m. After dropping off his wife, Smith began to make the short return trip home, and as he turned left into his subdivision, he failed to yield to an oncoming motorcyclist, causing the operator to slam into the passenger side of his vehicle. The motorcyclist died at the scene.

Smith immediately maneuvered his vehicle back to the crash site where he checked the victim, who was motionless. Shortly thereafter, other drivers stopped to render aid, and law enforcement officers soon arrived. Sheriff's Deputy Joseph Pounds was among the first to arrive, and he spoke with Smith, who stated that he was making the left turn and did not see the motorcyclist. Pounds viewed the damage to Smith's vehicle as consistent with an impact to the passenger side, and Pounds observed the odor of alcohol on Smith's breath. Based on this, Pounds proceeded to secure the scene and called the Georgia State Patrol to investigate.

---

[3] See *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998).

State Trooper Sheldon Osby responded to the call and spoke first to Pounds, who stated that Smith was "possibly impaired," and then he spoke to Smith, who was waiting in Osby's vehicle due to rain. Smith explained to Osby that he turned left in front of the motorcycle, and the trooper, who was trained in DUI investigation and field sobriety evaluations, noticed a strong odor of alcoholic beverage from Smith's breath. Osby asked Smith about the odor, and Smith replied that he had consumed two beers approximately two hours prior to driving. Osby then asked if Smith would submit to a field sobriety evaluation, and Smith agreed. Smith performed poorly on each phase of the field sobriety evaluation, and his breath indicated a positive result for alcohol based on an Alco-Sensor test. Based on this, Osby placed Smith under arrest and read him the implied consent warning for additional testing, and Smith agreed to a blood test for alcohol.

Another officer transported Smith to the local jail to have his blood drawn, which occurred at approximately 8:47 a.m., approximately one-and-a-half hours after the collision. The result of the blood test indicated a blood alcohol concentration ("BAC") of .136.

Based on these events, Smith was charged with homicide by vehicle through DUI less safe (Count 1), vehicular homicide through DUI per se (Count 2), DUI less

safe (Count 3), and DUI per se (Count 4). A jury found him guilty of all counts, and the trial court entered a 12-year sentence on Count 2, merging the remaining counts into that count. Smith now appeals.

1. Smith contends that the trial court erred by admitting evidence of a prior DUI arrest pursuant to OCGA § 24-4-404 (b). Based on the record in this case, this enumeration presents no basis for reversal.

Under OCGA §§ 24-4-404 (b) and 24-4-403,

[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[, but such] extrinsic act evidence may be admitted if a three-part test is met: (1) the evidence is relevant to an issue in the case other than the defendant's character, (2) the probative value is not substantially outweighed by the danger of unfair prejudice as required by Rule 403, and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the prior act.[4]

Prior to trial, the State provided notice of its intent to introduce evidence that Smith was arrested in June 2014 after an officer observed him driving erratically with an injury to his head, a broken windshield, and a road sign "wrapped around [his]

---

[4] *Jones v. State*, 301 Ga. 544, 544 (802 SE2d 234) (2017), quoting OCGA § 24-4-404 (b) and citing *Olds v. State*, 299 Ga. 65 (2) (786 SE2d 633) (2016).

4

vehicle." In his roadside interaction with Smith, the officer observed an odor of alcohol on Smith's breath and, based on his interaction with Smith, believed him to be "drunk." Smith unsuccessfully moved in limine to exclude this evidence, and at trial, the court admitted the evidence for the purpose of proving Smith's knowledge, intent, and absence of mistake or accident. Smith now asserts that this was error.

As a threshold matter, we note that Smith was only sentenced on Count 2, i.e., first degree vehicular homicide based on DUI per se, and the remaining counts merged into that count. This results in a conviction only as to Count 2 because the guilty verdicts on the other counts are not equivalent to a final judgment of conviction.[5] Accordingly, any error as to those counts is moot.[6]

With respect to the vehicular homicide predicated on DUI per se, the admission of other acts evidence, even if erroneous, can be harmless if there is overwhelming evidence to support the guilty verdict such that "it is highly probable that the error did

---

[5] See *Slack v. State*, 288 Ga. 659, 661 (706 SE2d 447) (2011) ("[U]nder our criminal code, a 'conviction' is defined as including 'a final judgment of conviction entered upon a verdict or finding of guilty of a crime or upon a plea of guilty.'"), quoting OCGA § 16-1-3 (4). See also *Collins v. State*, 327 Ga. App. 590, 592 (760 SE2d 606) (2014); *Durrance v. State*, 319 Ga. App. 866, n. 1 (738 SE2d 692) (2013) (Defendant "was not convicted of the DUI less safe offense . . . because the trial court merged [that] offense into the DUI per se charge.").

[6] See *Durrance*, 319 Ga. App. at 866 n. 2.

5

not contribute to the verdict."[7] For example, in *Jones v. State*,[8] the Supreme Court examined a DUI-per-se conviction and determined that due to the "very low" probative value of a prior DUI conviction to show intent, it was error to admit the evidence in a trial on a new DUI-per-se count.[9] Nevertheless, because the conviction was for DUI per se, and the evidence was uncontroverted that "appellant was driving his vehicle; appellant admitted he had consumed alcohol that evening; and the breath tests showed appellant's BAC was substantially in excess of 0.08 grams . . . the erroneous admission of the prior DUI was ultimately harmless."[10]

Similarly, in the present case, there was clear surveillance video footage showing the crash, Smith admitted that he was the driver of the vehicle that collided with the motorcycle and that he had been drinking alcohol before driving, and his blood test revealed a BAC well in excess of the .08 legal limit. Thus, the evidence that Smith committed DUI per se was overwhelming. Likewise, there was no dispute that Smith was driving the vehicle that killed the motorcyclist, thereby causing his

---

[7] See *Jones*, 301 Ga. at 551 (3).

[8] Id.

[9] See id. at 549-550 (2).

[10] Id. at 551 (3).

death.[11] Accordingly, pretermitting whether the trial court erred by admitting the prior DUI arrest, it is highly probable that any resulting error did not contribute to the guilty verdict as to the vehicular homicide count predicated on DUI per se, and the impact of such a potential error on the other counts is moot due to merger.[12]

2. Smith next argues that the trial court erred by denying his motion to suppress the results of his blood test, field sobriety evaluations, and statements he made to police at the scene. Specifically, Smith argues that all of the evidence gathered at the roadside should have been suppressed because he was not *Mirandized*[13] at the time the evidence was obtained. We disagree.

> In reviewing a trial court's ruling on a motion to suppress, an appellate court must construe the record in the light most favorable to the factual findings and judgment of the trial court and accept the trial court's findings of disputed facts unless they are clearly erroneous.

---

[11] See OCGA § 40-6-393 (a) ("Any person who, without malice aforethought, causes the death of another person through the violation of [the DUI statute] . . . commits the offense of homicide by vehicle in the first degree. . . .").

[12] See *Jones*, 301 Ga. at 551 (3).

[13] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

However, the trial court's application of the law to undisputed facts is subject to de novo review.[14]

Here, upon arriving at the scene, Deputy Pounds initially encountered Smith "standing around" outside of his vehicle and spoke to Smith to determine who was involved and what had happened. Smith told him that he was returning from dropping off his wife and "that he was making a left turn into the subdivision and didn't see the motorcycle." Pounds noticed an odor of alcohol on Smith's breath, and Smith mentioned that he had been out during the night before his wife woke him up to drive her to church. By this time, it had begun raining heavily, so Pounds had Smith sit in the back seat of his police cruiser while they talked further, "to get out of the rain" and because "I had no room in my front seat." Pounds testified at the suppression hearing that during that time, he allowed Smith to get out of his vehicle to urinate and to smoke a cigarette: "we were trying to stay out of the rain. It's really raining, so I'm not trying to get wet. He was you know, he could have stayed out there if he wanted to, but he got in. But then he gets back out a couple of times, actually." At no time did Pounds tell Smith he was under arrest, nor did he place Smith in handcuffs.

---

[14] (Punctuation omitted.) *State v. Blazek*, 353 Ga. App. 127, 128 (836 SE2d 213) (2019).

After approximately 20 minutes, Trooper Osby arrived and escorted Smith to his patrol vehicle. They spoke while standing in front of Osby's vehicle, and Smith explained that he turned left and did not see the oncoming motorcycle. As Smith spoke, Osby noticed an odor of alcohol coming from Smith's breath, so he asked if Smith had been drinking. Smith gave conflicting answers but admitted that he had consumed "a couple of beers a couple of hours prior to driving." Osby asked Smith if he would "submit to a few field sobriety tests," and Smith agreed to do so. Osby administered a horizontal gaze nystagmus test, walk and turn, one leg stand, and an Alco-Sensor test. Based on the results of the field evaluations, each of which readily indicated impairment (or the presence of alcohol in the breath test), Osby placed Smith under arrest for DUI. Osby then read him the implied consent warning for a blood test, and Smith initially declined but immediately changed his mind to take a blood test: "At first he said no. Then I said, you know, 'You said no?' Then he said yes. I said, 'Are you sure?' He said, yes, 'Yes, I am.'" Smith was then transported to the local jail, where a blood test was administered.

Smith contends that the statements he made, the field sobriety tests, and the blood test should have been suppressed because he was never read his *Miranda* rights.

The requirement to give a *Miranda* warning does not apply until a person is actually in custody or otherwise deprived of [his] freedom of action in some significant way. In making this determination, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. The test for determining whether a person is "in custody" at a traffic stop is if a reasonable person in the suspect's position would have thought the detention would not be temporary. The issue of whether one is in custody for *Miranda* purposes is a mixed question of law and fact, and we will not disturb the trial court's determination unless it is clearly erroneous.[15]

Here, Smith points to the fact that he was seated in the back seat of a police cruiser, which he argues is tantamount to being formally arrested. But this overlooks the evidence that he entered the cruiser voluntarily to avoid the rain, was free to leave the vehicle and did leave to urinate and smoke, and was never handcuffed or told he was under arrest. Under these circumstances, the record supports a finding that Smith

---

[15] (Footnotes and punctuation omitted.) *Parker v. State*, 307 Ga. App. 61, 65 (3) (704 SE2d 438) (2010).

was not "in custody" to the extent that a *Miranda* warning was required before officers spoke with Smith to ascertain the situation.[16]

Further, with respect to the breath test, "because a defendant's Fifth Amendment right against self-incrimination is not implicated by a State-administered breath test, the absence of *Miranda* warnings does not require suppression of [a defendant's] consent to the breath test under federal [Constitutional] law."[17] Likewise, "neither the Georgia right against compelled self-incrimination, the Georgia right to due process, nor a Georgia statute prohibiting compelled self-incrimination requires law enforcement to provide similar warnings to persons arrested for DUI before asking them to submit to a breath test."[18] And the record supports a finding that

---

[16] See id. ("It is well established that *Miranda* warnings are not required while an investigating officer conducts preliminary questioning or field sobriety tests, but apply only after a DUI suspect is arrested.") (punctuation omitted). See also *State v. Pastorini*, 222 Ga. App. 316, 317 (1) (474 SE2d 122) (1996) ("[R]oadside questioning during the investigation of a routine traffic incident generally does not constitute a custodial situation.") (citation omitted), overruled on other grounds by *State v. Turnquest*, 305 Ga. 758, 775 n.15 (827 SE2d 865) (2019).

[17] (Punctuation omitted.) *Fofanah v. State*, 351 Ga. App. 632, 634 (1) (832 SE2d 449) (2019).

[18] *Turnquest*, 305 Ga. at 758.

11

Smith's subsequent blood test was properly and voluntarily administered. Accordingly, this enumeration is without merit.

3. Smith next argues that the trial court erred by allowing the State to impeach him with statements he made to a magistrate during his bond hearing on this case because he was not *Mirandized* when speaking to the magistrate. Prior to trial, the State and Smith agreed that the State would not introduce those statements during the State's case-in-chief, but when Smith testified and minimized his alcohol use at the relevant time, the State sought to impeach him with contrary statements he made to the magistrate. Following a *Jackson-Denno*[19] hearing outside the presence of the jury, the trial court allowed the State to use the statements to impeach Smith, giving the jury an instruction about the permissible consideration of the impeachment evidence.[20] Smith now contends the trial court erred by doing so.

[19] 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[20] In his appellate brief, Smith makes a passing reference to an argument that the State's agreement not to use the bond hearing statements impacted his decision to testify, but he does not elaborate with authority or explain how, aside from impeachment, his decision to testify harmed him. He explained to the jury that he elected to testify because "I just wanted to tell my side of the story. . . . [T]his has been going on . . . since 2015[,] and I haven't been able to tell anybody what happened. . . . I don't want it to sound like it's just me, . . . because there's another family involved in this, but I just wanted to tell my side of the story because I've heard through people saying things that I just don't want to speak about, but . . . I

12

The evidence at issue came during Smith's bond hearing after he was arrested. At the outset of the hearing, the magistrate told Smith, "keep in mind anything you say can be used as evidence against you," but no formal *Miranda* warning was given. When the magistrate asked how much alcohol he had consumed, Smith equivocated, first saying one or two beers and then saying four at the most. Smith also told the magistrate that he must have misjudged distance when he turned left into the path of the oncoming motorcyclist. At trial, Smith testified in his defense, and after the trial court determined that the statements at issue were made voluntarily, the State used the statements he made to the magistrate to impeach his trial testimony that (a) he never saw the motorcyclist, and (b) he had only consumed two beers.

Pretermitting whether the statements at issue arose from a custodial interrogation for purposes of *Miranda*, this Court has held that "even if a statement cannot be admitted in order to establish guilt because it violates the prophylactic rule enunciated in *Miranda*, it is possible to admit such a statement for purposes of

---

wanted to be able to give an account of what happened[,] and I just wanted to speak for once." Smith was able to provide a favorable account of the events to the jury, explain his clear-headedness on the morning of the collision, minimize his consumption of alcohol, and express his remorse at the accidental loss of life. Accordingly, this passing reference to any impact on his decision to testify presents no basis for reversal.

13

impeachment," if the statement was made voluntarily.[21] This requires a determination whether Smith made the statements without "the slightest hope of benefit or remotest fear of injury."[22] This is interpreted "not in the colloquial sense, but as it is understood in the context within the statute . . . [,i.e., referring] to promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all."[23]

Based on a review of an audio recording of the bond hearing, it is plain that the magistrate did not make any threat or promise to Smith when she engaged in the colloquy with Smith about the circumstances of his arrest. She informally advised

---

[21] *Babbitt v. State*, 337 Ga. App. 553, 554 (1) (a) (789 SE2d 205) (2016). See also *Linares v. State*, 266 Ga. 812, 813 (2) (471 SE2d 208) (1996) ("Although a statement obtained in violation of *Miranda* may not be used in the prosecution's case-in-chief, it may be used to impeach the defendant's credibility if its trustworthiness meets legal standards. This test means that a court must find that the statement is voluntary under traditional due process analysis.") (footnote omitted). Compare *State v. Orr*, 305 Ga. 729, 733 n.2 (827 SE2d 892) (2019) ("[D]ue process under the Fourteenth Amendment prohibits the government from using, for impeachment purposes, evidence that the defendant exercised his right to remain silent after he was arrested and advised of his right to remain silent pursuant to *Miranda*.").

[22] OCGA § 24-8-824. See *Babbitt*, 337 Ga. App. at 555 (1) (a).

[23] (Punctuation omitted.) *Dawson v. State*, __ Ga. __, __ (3) (Case No. S20A0217, decided May 4, 2020).

14

Smith that his statements could be used as evidence against him, and she gave no indication that any admissions would bear on her decision to grant or deny bond. Under the totality of these circumstances, the trial court did not err by finding that Smith's statements at the bond hearing were made voluntarily. Accordingly, the trial court did not abuse its discretion by allowing the State to impeach Smith's trial testimony with his prior inconsistent statements from the bond hearing.

4. Last, Smith contends that the trial court erred by failing to give his requested jury instruction on proximate cause, specifically:

> In prosecutions for vehicular homicide, the State must prove that the defendant's conduct of driving under the influence of alcohol to was the "legal" or "proximate" cause as well as the cause in fact, of the death. And although contributory negligence, as such, is not a defense in a vehicular homicide case, the conduct of the decedent whether negligent or not, is material to the extent that it bears upon the question of whether under all the circumstances of the case the defendant was negligent, or, if negligent, whether the decedent's negligence was the sole proximate cause of the injury, or whether the injury or death resulted from an unavoidable accident.

We review jury instructions "as a whole in determining whether the charges contained error. And it is not reversible error to fail to charge in the exact language requested when the charge given adequately covers the correct legal principles."[24]

Here, the trial court instructed the jury as follows, in relevant part:

A person commits the offense of homicide by vehicle in the first degree when without malice aforethought that person causes the death of another person while there is an alcohol concentration of 0.08 grams or more in the person's blood at any time within three hours after such driving ended. Proximate cause exists when the defendant's act played a substantial part in bringing about or actually causing the victim's death, and the death was either a direct result or a reasonably probable consequence of the act. If you find based on all the facts and circumstances of this case that the defendant's conduct was a substantial factor in causing the victim's death, then any negligence on the part of the decedent would be irrelevant.

This was a correct statement of the law and adequately recited the principle of proximate cause, even as it relates to the conduct of the decedent. As noted by the trial court, a nearly identical charge was deemed adequate in *Hartzler v. State*,[25] and

---

[24] (Footnotes and punctuation omitted.) *Johnson v. State*, 341 Ga. App. 425, 431 (2) (801 SE2d 294) (2017).

[25] 332 Ga. App. 674, 680 (3) (774 SE2d 738) (2015).

the trial court's charge in this case, as a whole, properly encompassed the concept of causation with respect to vehicular manslaughter. "[A]s long as the defendant's negligence proximately caused the injury of another, the crime has been committed. . . . Unlike the civil context, in the criminal context it simply is not relevant that the victim was negligent unless the defendant's conduct did not substantially contribute to the cause of the injury."[26] Accordingly, this enumeration presents no basis for reversal.

*Judgment affirmed. McFadden, C. J., and Hodges, J., concur.*

---

[26] (Punctuation and emphasis omitted.) *Corbett v. State*, 277 Ga. App. 715, 718 (1) (b) (627 SE2d 365) (2006).